Joshua Lapin, Pro Se Plaintiff

401 E 8th ST
STE 214 PMB 7452
Sioux Falls SD 57103

Email: thehebrewhammerjosh@gmail.com

Facsimile: (605) 305-3464

**UNITED STATES DISTRICT COURT**

**DISTRICT OF COLORADO - DENVER**

| | |
|---|---|
| Joshua Lapin | Case No.: 1:22-cv-01543-CMA-SKC |
| Plaintiff, | |
| vs. | **PLAINTIFF'S RESPONSE TO DEFENDANT FLEX MARKETING GROUP, LLC'S MOTION TO DISMISS UNDER RULE 12(B)(2) AND RULE 12(B)(6)** |
| NRRM LLC dba CarShield | |
| American Auto Shield LLC | |
| Flex Marketing Group, LLC | |
| John Doe Sender | |
| Defendants | |

# INTRODUCTION

COMES NOW Plaintiff, responding in opposition to Defendant Flex Marketing Group's motion to dismiss under rule 12(B)(2) and Rule 12(B)(6).

# ARGUMENT AND RESPONSES

**Personal Jurisdiction**

Plaintiff does not allege this court has personal *general* jurisdiction over Flex Marketing Group, and

agrees with Defendant on this point alone.  Plaintiff's opposition to the instant motion, as it relates to Personal Jurisdiction, rests entirely on the question: Does this court have personal *specific* jurisdiction over Flex Marketing Group?

### Specific Jurisdiction Inquiry Collapses Into Due Process Inquiry

"[I]n enacting the Colorado Long Arm Statute, our legislature intended to extend the jurisdiction of our courts to the fullest extent permitted by the due process clause of the Fourteenth Amendment to the United States Constitution. Therefore, the only question which we must determine is whether exercise of jurisdiction over the petitioner comports with the protection of the due process clause" *Am. Web, Inc. v. Flom Corp.*, Civil Action No. 11-cv-02444-WYD-KMT (D. Colo. Mar. 25, 2013)  See Also, *Dietz v. Dietz,* Civil Action No. 11-cv-0 1692-RBJ-KMT (D. Colo. May 29, 2012) "Colorado's long-arm statute is consistent with due process clause of the Constitution and 'extends the jurisdiction of Colorado courts to the fullest extent permitted by the due process clause of the United States and Colorado Constitutions.' " quoting from *Classic auto Sales, Inc. v. Schocket,* 832 P.2d 233, 235 (Colo. 1992).

### Flex Marketing Group Has Sufficient Minimum Contacts to Satisfy Due Process

Flex Marketing Group registered itself as a foreign entity in Colorado less than two years ago [Exhibit A], and thereby availed itself to the privilege of transacting business in the Centennial State.  It also applied for and obtained a sports betting vendor Minor license [Exhibit B], which was issued to Flex by the Colorado Department of Revenue.  Flex's key principal Michael Held explains why in his declaration in support [of the instant motion] : to "comply with an advertising partner's requirements[1]."  Flex admits it created these ties with Colorado so that it could do business with a Colorado advertiser, thereby availing itself to the benefits and protections of this state. While unknown who this "advertising partner" is, it *is* known that Sports Betting Vendor Minor Licenses in the state of Colorado are issued to those who are "employed for, contracts with, or acts on behalf of an establishment licensed to operate sports betting…" Colorado Secretary of State

---

[1] This is my first ever footnote, and I'm honored it is in this suit. Back on track: Plaintiff does not know the identity of this "advertiser," as the State of Colorado Dept. of Revenue denied a CORA request related to the same.

[Exhibit C].  Held argues the partnership "generated less than $200 total," but Flex chose to file its Period Report merely nine months ago [Exhibit D], thereby renewing its registration in Colorado for one more year.  Also, the periodic report was filed 10 months and 24 days AFTER the sports betting minor license was issued.  Therefore, Plaintiff believes and alleges that Flex chose to renew its legal existence in the state of Colorado, and "*purposefully* keeping the door open," long after any time material to its short-lived partnership with its Colorado-registered Casino advertising partner.  As of now, its sports betting minor license and its foreign registration are "active" and valid until November of 2022 and October 2022 respectively.  Flex Marketing Group maintains a registered agent in Boulder, where it was served with this suit [Exhibit E].

Independently of the above, Flex promotes at <u>least</u>[2] two Coloradan ("Advertisers"), American Auto Shield LLC and Colorado Christian University[3], as part of the same "national in nature" email marketing campaign that Held admits to in the same declaration.

**Flex Marketing *allegedly* Uses an In-Forum (Lakewood, CO) Address to Illegally hide its Identity in The Spams At Issue**

In many of Flex's estimated 2143 spams received by Plaintiff, only 57 of which (2.65%) advertise NRRM / AAS.. Flex *attempts* to fulfill the "physical address requirement of the CAN-SPAM Act of 2003" [Exhibit F] by pairing one-of-three fictitious, non-registered, apparently "made up" business names[4] with one-of-four different virtual boxes furnished by Earth Class Mail, Inc.[5] Of the 34 Flex-associated spams at issue in this case, 17 do not have a Earth Class Mail address for Flex

---

[2]Plaintiff is only privy to spam ("Advertisers") based on spam emails sent to <u>him</u>: Flex *may* have more CO advertisers.
[3]Colorado Christian University is not named in this suit in the original complaint.  It is believed to have also advertised in spams sent by Flex Marketing Group, with similar characteristics and illegalities for any material purpose.
[4]These 'made up' business names, placed in the bottom of some of the UCE's, paired with one of the four Earth Class Mail Addresses, include but are not limited to "Job Shark", "Jobs Delivered", "Plan Your Future Co",
[5]These addresses include PO Box 4668 #85919 New York NY 10163, PO Box 660675 #85919 Dallas TX 75266, PO Box 10188 #85919, Newark, NJ. 07101-3188 and PO-BOX #37635 #85919 Philadelphia,PA #19101-0635. While not discovered at the bottom of any UCE's, another similar address has been associated with Flex's operation: PO Box 660675 #85919 Dallas TX 75266

3

1  whatsoever, and instead **ONLY** lists an In-forum address for In-forum defendant American Auto

2  Shield, as well as an address for Missouri-based CarShield.  Flex is alleged to have Initiated these

3  spams on behalf of Carshield and American Auto Shield, so as the sender it is required by CAN-

4  SPAM to include a "physical address." The FTC released a "CAN-SPAM Act compliance guide for

5  business" in 2009 [Exhibit G]. Paragraph 4 of this guide reads, *"Tell recipients where you're*

6  *located. Your message must include your valid physical postal address. This can be your current*

7  *street address, a post office box you've registered with the U.S. Postal Service, or a private mailbox*

8  *you've registered with a commercial mail receiving agency established under Postal Service*

9  *regulations."*  Therefore, in 17 / 34 of the spams Flex sent on behalf of AAS & Carshield, Flex

10 fulfills its legal requirement of 'tell[ing] recipients where [its] located', by fradulently using In-

11 forum defendant AAS's Lakewood address "American Auto Shield, 1597 Cole Blvd #200,

12 Lakewood, CO 80401," as well as "Carshield's 333 Mid Rivers Mall Drive, St. Peters, MO 63376."

13 Therefore, an In-Forum address was a *material* part of a greater effort to conceal its identity while

14 running a multifaceted, multi-state spam-email racketeering operation. This is a highly material In-

15 forum "minimum contact," of which Plaintiff's claim "arises out of " AND "relates to."

16 "As the Supreme Court has explained, "where individuals 'purposefully derive benefit' from their

17 interstate activities it may well be unfair to allow them to escape having to account in other States

18 for consequences that arise proximately from such activities; the Due Process Clause may not

19 readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily

20 assumed.  *Art Corporate Solutions, Inc. v. Laney,* Civil Action No 14-cv-03086-RBJ (D. Colo. Feb.

21 24, 2015), quoting from *Burger King,* 471 U.S. at 473-74.  Flex's In-Forum activities could hardly

22 be more applicable to *Id.*  See also, *Grynberg v. Ivanhoe Energy, Inc.,* 490 F. App'x 86 (10th Cir.

23 2012) "Traditional notions of fair play and substantial justice are not offended if the "district court's

24 exercise of personal jurisdiction over a defendant with minimum contacts is reasonable in light of

the circumstances surrounding the case." *AST Sports Sci., Inc.*, 514 F.3d at 1061 (quoting *Pro Axess, Inc. v. Orlux Distrib., Inc.*"

**Flex Marketing Group *allegedly* promotes In-forum Defendant American Auto Solutions Through a Complex, Sophisticated, Illegal Multi-State Spam operation designed to Reach a 50-State Nationwide Audience, and Funnel said Audience to a <u>Focal Point</u> In the Forum**

Plaintiff's believe and alleges that this complex racketeering operation of Flex Marketing Group, as plaintiff has come to understand, works as follows:

1) Many 'Advertisers' sign up with New-York based Flex Marketing Group [Exhibit H]

2) Flex and Michael Held register *thousands* of domain names at Ft. Lauderdale-based domain registrar Moniker Online Services LLC AND Metairie, Louisiana-based domain registrar DNC Holdings Inc. These domains[6] are intended to be used to violation national and state spams laws, a violation of Moniker's Anti-Abuse policy [Exhibit I] and DNC Holdings's terms [Exhibit J]. These domains are registered under *many* varied untraceable fictitious names,[7] random "disposable" email addresses[8] that are likely unchecked, and do not have the @flexmg.com domain which Flex uses for its email addresses which it **wants** to be traceable to, and associated therewith. Further, the phone numbers in the WHOIS data seems to be one of 8 different numbers[9], which always rings to voicemail each time, after playing the same corny hold music. Finally, the address in the WHOIS is one of the five Earth Class Mail virtual addresses listed in footnote #5, in violation of ECM's TOS: "You may not state or imply that your ECM MailRoom address is a physical location where you, your personnel, or your operations are physically located." [Exhibit K, highlighted section]

---

[6] The 11 domains used in Flex's spams sent to Plaintiff include buzzbarrelnews.com, buzzbarrelreview.com, dzlosurverys.com, emails-jobsdelivered.com, entirelybelieve.com, expectcarecare.com, jobsdeliver.com, jobSharkNL.com, NationalShopperSurvey.com, NationalSurveysOnline.com, RumorFox.com

[7] These are NOT the same names as the ones at the bottom of the UCE's as described in footnote 4. These refer to the 'registrant name' used in the publicly available WHOIS Data, and include Lincoln Smith / Lincoln Log Networks LLC, DLZ Offers, Consumer Concierge, Dealzingo, and oftentimes simply "REDACTED FOR PRIVACY"

[8] Such as info@nationaldigitalsurvey.com, chrisjamesonwp@gmail.com, dealzingocustomerservice@gmail.com, motivatedtechnicianmarketing@gmail.com, info@dlzoffers.com, info@jobshark.co, info@consumerconcierge1.com, etc

[9] Including (646) 514-9199, (800) 418-8043, (732) 358-0457, (505) 348-5572, (646) 543-1795, (844) 435-3969, (443) 457-3539, (800) 476-1481

3) Flex is alleged to funnel these *many* domains, registered with *many* combinations (or permutations) of systematically invaid-or-misleading WHOIS data, through at **_least_**[10] four different email marketing platforms; the result is that the domains appear in the 'from line' of the spams, and also that the spams are traceable only to the "protected computers" of the email marketing platforms which have been hijacked, weaponized, and zombified into sending these spams far and wide, in violation of all those platforms' terms of service or acceptable use policy agreements. These platforms include:

   A) Austin-based Aurea Inc, whose allegedly violated terms are highlighted in the original complaint, pages 47-49,

   B) Infusion Software Inc dba Keap, whose allegedly violated terms are highlighted in the original complaint in pages 37-42,

   C) Los Angeles-based J2 Global Inc,[11] whose allegedly violated terms are highlighted in the attached [Exhibit L],

   D) Seattle-based Amazon SES,[12], whose allegedly violated terms are highlighted in the attached [Exhibit M].

4)  Flex often, but not always, includes some combination of the fictitious names AND Earth Class Mail addresses of Footnotes 4 and 5.

This alleged operation is remarkably similar to the events leading to the criminal indictment of the infamous and notorious "snoeshoe spammer" Michael Persaud [Exhibit T]

Flex is alleged to have funneled the Carshield / AAS spams from 3 of the 4 platforms listed above, to a nationwide audience (Held Declaration), in order to funnel traffic to a focal point within the forum, with the intention of benefiting in-forum Defendant AAS.  This relates to the often cited 10th circuit case Dudnikov v. Chalk, 514 F.3d 1063 (10th Cir. 2008) "Thus, while, as defendants emphasize, the NOCI formally traveled only to California, it can be fairly characterized as an

---

[10]Similar to the point made in Footnote #2, plaintiff is only aware of the email marketing platforms which were hijacked in the furtherance of UCE's sent to **him.**  Lord only knows how many others were used in furtherance of the spread of these UCE's sent to **others.**

[11]J2 Global Inc, as best known to plaintiff, was a California Company at all times material, but is now knows as Ziff Davis, a New York company listed on the NYSE.

[12]At the time of filing the original complaint, Plaintiff was yet to uncover that Flex had sent him spams from Amzn SES.

intended means to the further intended end of canceling plaintiffs' auction in Colorado." *Id* "Their "express aim" thus can be said to have reached into Colorado in much the same way that a basketball player's express aim in shooting off of the backboard is not simply to hit the backboard, but to make a basket."

As applied to the instant matter, Defendants reached plaintiff and many others by casting its allegedly-non-CAN-SPAM-compliant[13] net nationwide, with the express aim of funneling the resulting traffic and conversions into the forum.

### These Actions Justify a Stream of Commerce Plus Theory of Personal Jurisdiction; Meets the Asahi Standard

The US Supreme Court [in]famously decided *Asahi Metal Industry Co., Ltd, v. Superior Court of California* 480 U.S. 102 (1987), finding that "The placement of a product into the stream of commerce, **without more**, is not an act of the defendant purposefully directed toward the forum State." *Id* The use of an in-forum address in lieu of their own as it relates to the CAN-SPAM Act's "physical address requirement" [Exhibit F], as well as the aformentioned nationwide effort to funnel traffic into the forum, on behalf of the in-forum defendant, amongst other arguments herein, satisfies the "plus" component of *Id*, and "neither the lack of defendants' physical presence in Colorado nor the fact that they used a [California, Texas, Washington, and Arizona servers, as applied to the instant case] to effectuate this purpose diminish this fact." *Dudnikov*.  This focal point is "purposefully directed," no one forced Flex to promote AAS so aggresively, nor is the same a "random, fortuitous, or attenuated [contact]" *Paul v. TÜV Rheinland AG*, Civil Action No. 16-cv-02599-RBJ (D. Colo. July 25, 2017), quoting from *Burger King*, 471 U.S. at 475.

### Flex only sent  59% of spams at issue, it is not the "center of gravity"

All 57 spams complained of advertise Carshield / AAS, but only 59% were Initiated by Flex.  John Doe's citizenship is unknown, but his/her in-forum efforts are already known.  The Southern District of New York would lack jurisdiction over the DOE defendant due to their unknown citizenship, as it just ruled in Plaintiff's SDNY case Lapin V Doe 1:22-cv-04144-GHW "Plaintiff's

---

[13] All of plaintiff's state-law claims, and more claims he lacks standing to assert, are all alleged to be unlawful under the CAN-SPAM Act of 2003.  Accordingly, no defendant can plausibly allege these emails were lawful anywhere in the United States of America.

allegations that he doesn't know the citizenship of defendants but that it is "unlikely" that they are citizens of South Dakota are also insufficient [for purposes of Diversity Jurisdiction]" *Id*, Dkt. 4, and accordingly Flex's efforts to consolidate this case (and the related cases) into the Southern District of New York through their declaratory judgment action against plaintiff in the SDNY, *Flex Marketing Group V Lapin* Case 1:22-cv-06179-AT, complaint at Dkt. 1, is expected to fail for that same reason, among others.

Finally on the issue of specific jurisdiction over Flex, *Anzures v. Flagship Rest. Grp*., 819 F.3d 1277 (10th Cir. 2016) held that sales made on behalf of defendants in the forum were "NOT jurisdictionally related to [plaintiff's] tort claims" and therefore could not support a finding of specific personal jurisdiction."  In the instant matter, Flex's [attempted] sales made on behalf in-forum contacts are VERY jurisdictionally related to the instant Plaintiff's claims; therefore the reverse circumstances present themselves than in *Anzures,* and specific personal jurisdiction is warranted per the same findings.

**A Claims HAS Been Stated Against Flex, Even though its own products are not Advertised**
    **The *Blanchard* Decision is Isolated, Outnumbered, and Contradicted in its own Court**

Newman supports his argument that Plaintiff cannot state a claim against "Initiator" Flex Marketing Group, and that Plaintiff can only state a claim against *the* "advertisers" whose goods and services are advertised in the emails, by citing to <u>one</u> case in the Northern District of California *Blanchard v. Fluent, Inc*., No. 17-CV-04497-MMC, 2017 WL 4224768, *1 (N.D. Cal. Sept. 22, 2017).

However, Mr. Newman forgot to mention that the same court (Northern District of CA), has found precisely the opposite *twice* :  *Hypertouch, Inc. v. Azoogle.com*, Inc., No. C-08-4970 MMC (N.D. Cal. Mar. 19, 2009) AND *Moreland v. AD Optimizers, LLC,* Case No.: 13-00216 PSG (N.D. Cal. Apr. 8, 2013) In the former case, the Hon. Maxine Chesney "debunks" Newmans argument, as well as the *Blanchard* decision, more eloquently than the pro se Plaintiff ever could:  "Contrary to Azoogle's argument, the First Cause of Action, to the extent Hypertouch seeks to establish thereby Azoogle's liability for emails that do not advertise Azoogle's own products or services, is

not subject to dismissal for failure to state a claim. Section 17529.5(a) makes it "unlawful for any person or entity to advertise in a commercial e-mail advertisement sent from California or sent to a California electronic mail address," where such advertisement contains certain false or misleading statements, see Cal. Bus. Prof. Code § 17529.5(a), and includes no requirement that the "person or entity" must have been advertising **its own products or services.**"  Accordingly, Initiator Azoogle was liable for advertising other company's goods or services.  This decision was reiterated in the Northern District of California not long thereafter by the Hon. George Moreland, "Lopez's argument that the difference in statutory language means that Section 17529.5 applies only to companies whose products are advertised in spam email does not comply with California courts' interpretation of the law. California courts instead have applied Section 17529.5 both to companies that advertise in spam messages and to those that create and send third-party spam advertisements." *Moreland*, as cited previously.

Independently of the Northern District of California, Californian courts and the 9th circuit have held "Initiators" liable under 17529.5.  "For example, in *Balsam v. Trancos, Inc*., a company that developed and sent out third-party advertisements was  subject to Section 17529.5 liability despite not advertising its own services." *Moreland*, citing to *Balsam v Trancos*, 203 Cal. App. 4Th 1083, 1092 (2012). Concurring with all of the above, The Hon. Richard A. Alder performs a thorough legislative history and analysis of 17529.5 in *Hypertouch, Inc. v. ValueClick, Inc*., 192 Cal.App.4th 805 (Cal. Ct. App. 2011), concluding with "In sum, both the text and legislative history of Senate Bill 186 make clear that section 17529.5 was intended to apply to entities that advertise in deceptive commercial e-mails, not only the spammers who send them." *Id.*  This brilliant and detailed analysis leading to this conclusion is so "perfect and compelling," plaintiff has attached the aforementioned ORDER as [Exhibit N], and encourages Your Honor to read/skim it, and to consider adopting the same to the instant case.

Approximately this time last year, the California Court of Appeals readdressed many aspects of 17529.5, including whether the marketing partners are independently liable under 17529.5, in *Greenberg v. Digital Media Solutions, LLC,* 65 Cal.App.5th 909 (Cal. Ct. App. 2021).  It conceded

the existence of a "conflicting authority on whether spam recipients can state a claim [against Initiators] under [17529.5]" *Id.* It goes on to argue that "California appellate cases have held or assumed they can," before citing to the same *Balsam* and *Hypertouch* cases as Plaintiff above, but also that "At least one federal district court has held they cannot," citing to the same *Blanchard* decision as Mr. Newman in the instant motion.

**Even if Blanchard Holds, Flex Marketing is Still Liable**

While *Blanchard* is very outnumbered in its own court and other California courts...even *IF* this court follows *Blanchard,* Flex is still liable.  *Blanchard* leaves open the possibility of stating the claim against an "Initiator" if a conspiracy [to advertise in the spams] can be plausibly alleged, "Even assuming a sender, under a theory of conspiracy, can ever be held liable for an advertiser's violation of § 17529.5, however, plaintiffs fail to allege any facts to support their conclusory assertion that Panda Mail conspired to violate § 17529.5." *Id*

This possibility was further explained in a Federal Case in the Eastern District of New York which relied on *Blanchard: Bank v. Hydra Grp. LLC, 10 Civ. 1770 (VMS) (E.D.N.Y. Mar. 31, 2019)* "Plaintiff may have been able to establish Hydra's involvement had he preserved a record of the "jump site" to which he was directed when he clicked on the hyperlinks in the subject emails, through the use of, for instance, screenshots, printing, or even a video recording of his computer screen showing what occurred when he clicked on a hyperlink. See, e.g., United States v. Cyberheat, Inc., No 05 Civ. 457 (TUC) (DCB), 2007 WL 686678, at *8-9 (D. Ariz. Mar. 2, 2007) (discussing methods used to "preserve[] the web page or pages to which the hyperlinks [in the emails at issue] redirected")*.*" And also, "Plaintiff has failed to prove by a preponderance of the evidence that Hydra had any involvement in the subject emails, as an advertiser, or sender, or even as a provider of material assistance." *Id.*  The court accordingly dismissed the complaint as to Hydra, concluding that its alleged role in having a "material role in sending [the spams]" was inadequate.

In **sharp** contrast, The *instant* plaintiff **can** allege a conspiracy between Flex and [Flex's advertisers] to advertise in these spams, independently of Flex's Initiation of those same spams, and

does so as follows:

Plaintiff alleges that the domains (clickable links in the call-to-action) in most-or-all of the spams at issue belong to the respective email marketing platform whose servers the particular spam originated from.  However, after the recipient clicks on the main call to action, they are redirected to at *least* one of several "redirecting links" owned, operated, and controlled by Flex, before eventually redirecting to the NRRM/AAS "advertiser" landing page.  These domains include:

http://www.trk1.whatsnxtsteps.com/?R=C&U=2742976&E=john.doe%40example.com

http://www.mo4mo.providelifeinsurance2.com/?R=C&U=2727833&E=ketosoup97@gmail.com&hq_e=el&hq_m=4629904&hq_l=1&hq_v=c169959d3b

http://www.1.jobalertrk.com/?R=C&U=2727437&E=ketosoup97%40gmail.com

http://www.sta1.purposeautoinsurance.com/?R=C&U=2725429&E=ketosoup97@gmail.com

http://www.do.moveforwardhere.com/?R=C&U=2724855&E=ketosoup97@gmail.com

http://www.meto.dzlohere.com/?R=C&U=2728271&E=ketosoup97@gmail.com&hq_e=el&hq_m=4630040&hq_l=1&hq_v=fc37dcdb51

Plaintiff can demonstrate that these 'redirect domains' belong to Flex. While some of these domains now have "REDACTED" whois data, or are even listed for sale[14], plaintiff purchased historic whois data and has uncovered that most of these "redirecting domains" ha[d] a 'registrant name' of IMPERIAL MARKETING GROUP, paired with a 'random state' of Maryland or even Wisconsin. Plaintiff has verified this name does not exist in MD or WI, but it **IS** a registered fictitious name[15] for Flex Marketing Group in the state of New York. [Exhibit O]  The spams would not function, nor would the Advertiser be able to display their landing page, without Flex's redirecting domains connecting the recipient from the "click" of the call-to-action to the eventual landing page; these are also alleged to enable Flex to track the performance of their spams, and to enable Flex to charge its Advertisers to chose between a method of acquisition of "cost per [lead, click, or sale]" [Exhibit V].  It also enabled Flex to "disable" these spams after they were sent; accordingly, these spams no longer function, and land on a since-deleted blank page belonging to one of Flex's redirecting

---

[14]This is similar to what Flex is alleged to be doing with the sending domains even after being put on notice to preserve the same, Dkt. 11, as well as plaintiff's reply to Flex's response to the same

[15]This revelation does not concede that the domains were ever 'readily traceable' for purposes of the cause of action.

1. domains.  These "redirecting domains," owned by Flex, nonetheless **have** been caught on video,
2. and therefore the instant plaintiff can satisfy the burden which the plaintiff in *Hydra* had failed
3. "[plaintiff couldn't produce] even a video recording of his computer screen showing what occurred
4. when he clicked on a hyperlink." *Hydra*, as cited previously.  The screen recording [video] has been
5. made available for the court here:
6. https://drive.google.com/file/d/16fTc69KddWiMW0Kaq7KXXtWZyMX4gs7M/view?usp=sharing
7. **Flex contractually consented to Advertisers' Liability.**
8.     - Domain Registrations
9. In various overlapping contracts, Flex accepted the very liability they attempt to shift onto the
10. Advertisers.  All of the sending domain of footnote 6 AND all of the redirecting domains listed in
11. page 11 are governed by the Domain Registration Agreements of EITHER Moniker Online
12. Solutions LLC OR Dnc Holdings Inc, as well as supplemental agreements from either of these two
13. domain registrars.  Both domain registrants are ICANN-accredited, and both agreements <u>DO</u> and
14. <u>MUST</u> incorporate the ICANN's 'registrar accreditation agreement,' *WEBSTAT.COM, L.L.C. v.*
15. *WEB TRACKING SERVICES, L.L.C.*, No. 2:03-CV-00977 (D. Utah July 15, 2004) "[R]egistrars
16. have agreed, or have been required by ICANN [Internet Corporation for Assigned Names and
17. Numbers], to incorporate the UDRP into registration agreements . . . and registrants must accept the
18. UDRP's terms in order to register a domain name." quoting from *Sallen v. Corinthians*
19. *Licenciamentos LTDA*, 273 F.3d 14 (1st Cir. 2001).
20. This incorporated registrar accreditation agreement includes *at least* two important sections:
21. 3.7.7.3 "...A Registered Name Holder licensing use of a Registered Name according to this
22. provision shall accept liability for harm caused by wrongful use of the Registered Name, unless it
23. discloses the current contact information provided by the licensee and the identity of the licensee
24. within seven (7) days to a party providing the Registered Name Holder reasonable evidence of
25. actionable harm."
26. Secondly, under "Domain Name Registrants' Responsibilities:"  "3.You will assume sole
27. responsibility for the registration and use of your domain name."  And Plaintiff reminds the court
28.

that the sending domains AND the redirecting domains (paramount to the advertising within the spams) were governed by these provisions.

**- Email Marketing Platform Agreements**

Independently of the domain registration agreements, the contracts governing email marketing platforms described in page 6 similarly render Flex liable for the actions of the ("Advertiser").

   **-Infusionsoft dba Keap**

First, Infusionsoft dba Keap has the following in its terms of service [Exhibit P]: "You are solely responsible for Your products and services, promotions and campaigns, including any and all injuries, illnesses, damages, claims, liabilities and costs suffered in respect thereto." and also "You warrant that Your business shall comply with these Terms and with all applicable federal, state and local laws and regulations, as well as all incorporated policies, in connection with Your access to and use of the Keap Service...You further represent and warrant that You will not violate any laws and/or regulations that govern Your entity, industry, or relationship with Your own Contacts, including but not limited to consumer protection, privacy, data security, advertising, intellectual property or other laws; or engage in unethical, false or misleading advertising,"

   **-Aurea Inc**

For email marketing platform Aurea Inc, in its 'SaaS Terms and Conditions,' [Exhibit Q]: "The Customer shall be liable for any violation of obligations by its Authorized Users or by other third parties who violate obligations within the Customer's control."

**Choice of Law For Allegations of Receiving Spam Should Be South Dakota; NOT CO or NY.**

Setting aside that "Federal courts regularly decline to conduct fact-intensive choice of law analyses at the motion to dismiss stage…" *F.D.I.C. v. First Interstate Bank of Denver*, 937 F. Supp. 1461, 1466 (D. Colo. 1996) "A definitive choice of law determination is inappropriate and premature at this Rule 12 phase of the case stage" *Id*, quoting from *Feingold v. State Farm Mut. Auto. Ins. Co.*, 2012 WL 1106653, Newman dramatically and materially oversimplifies Colorado's adoption of the most significant relationship tests <u>contacts</u> from the Second Restatement for the purposes of choice-of-law in tort actions by cherry-picking *Goodyear*. "In tort cases, such as this one, Colorado's choice-of-law standard is the "most significant relationship" test, as articulated in the Restatement (Second) of the Conflict of Laws §§ **6**, **145**, **171** (1971) (the "Restatement")" *Marshall v. Exelis Sys.*

1  *Corp.,* Civil Action No. 13-cv-00545-CMA-KMT (D. Colo. Aug. 26, 2014) (bold and underline
2  added).  In addition to the four contacts listed by Mr. Newman from  "...Conflict of Laws §§ 6," §§
3  145 also calls for the court to analyze the following factors: (a) the needs of the interstate and
4  international systems, (b) the relevant policies of the forum, (c) the relevant policies of other
5  interested states and the relative interests of those states in the determination of the particular issue,
6  (d) the protection of justified expectations, (e) the basic policies underlying the particular field of
7  law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and
8  application of the law to be applied.  In reference to A: It is very unclear if South Dakota courts can
9  haul a defendant into its courts, while conforming with due process, simply by sending or
10 advertising in a spam email sent into the South Daktoan forum.[16] For that reason, it is important for
11 defendant's home forum to grant full faith and credit to the laws of South Dakota, if its courts are
12 unable to enforce their own laws in these circumstances. (Reference Conflict of Laws §§ 6,
13 comment K as it relates to "Reciprocity")
14 As it relates to B and C, forum-state-Colorado's policy strongly points towards applying South
15 Dakota's spam law.  Colorado's "Spam Reduction Act of 2008" contains a relevant
16 provision related to this: "The remedies, duties, prohibitions, and penalties of this subsection (4)
17 are not exclusive and are in addition to all other causes of action, remedies, and penalties provided
18 by law." Therefore, the forum states policies  advocate for applying other remedies available to a
19 spam-recipient.  Further, the forum states interests and spam law and are inapplicable to these
20 circumstances or to the plaintiff, "(h)  This section shall apply when a commercial electronic mail
21 message is sent to a computer located in Colorado or to an electronic mail address that the sender
22 knows, or has reason to know, is held by a Colorado resident."  South Dakota's spam law, however,
23 is similarly intended to protect its own residents from spam; it has a valid interest in doing so.
24 As to G, the location of injury is fortuitous as one does not know if they will be physically
25 located in-or-out of their domicile at the time they receive junk email.  With that in mind, "Thus, the
26 clear purpose of the Consumer Protection Act is to protect Washington citizens against deceptive

---

[16]This question is currently being litigated in Minnehaha County Court, Lapin V Zeetogroup LLC 49CIV22-000725

14

MOTION

1 practices, not, as the Plaintiffs invoke it here, to protect non-Washington citizens against deception by Washington's merchants." Elvig v. Nintendo of America, Inc., 696 F. Supp. 2d 1207 (D. Colo.

2 2010). The court then refused to apply Washington consumer protection law to Nintendo, against

3 Plaintiff's wishes for the same reason. Herein, in contrast, the cause of action *IS* applicable per the

4 same reasons as in *Elvig*.

5 New York has no interest in the matter through its absence of any spam legislation. Further, while

6 Flex is a NY company, the emails were sent from the servers of the email marketing platforms in

7 Sacramento, Phoenix, and Dallas respectively, under the laws of those respective states, occurring

8 wholly outside of the State of New York; Flex cannot hide behind its irrelevant domicile.

9 **Plaintiff IS a Domicile AND Resident of South Dakota, should be Treated as such.**

10 *Smith v. Cummings*, 445 F.3d 1254 (10th Cir. 2006) "To establish domicile in a particular state, a

11 person must be physically present in the state and intend to remain there. Keys Youth Servs., Inc. v.

12 Olathe, 248 F.3d 1267, 1272 (10th Cir. 2001). Once domicile is established, however, the person

13 may depart without necessarily changing his domicile. To effect a change in domicile, two things

14 are indispensable: First, residence in a new domicile, and second, the intention to remain there

15 indefinitely." *Crowley*, 710 F.2d at 678." Plaintiff sufficiently established a South Dakota domicile

16 and then embarked on a nomadic lifestyle, establishing no new residency elsewhere. The State of

17 South Dakota has clear and specific requirements for establishing residency within the state for full-

18 time travelers [Exhibit R]. He fulfilled those requirements and submitted the same to the Rapid

19 City,SD DMV; please see highly important "Residency Affidavit," sworn under perjury, and other

20 supporting residency documents, in Exhibit S. Plaintiff's domicile is solidly established by his

21 sworn residency affidavit, and his 30-day-new-country 'vagabond lifestyle' substantiates he has not

22 established residency or domicile elsewhere; this is supported by a detailed account of plaintiff's

23 whereabouts at all times material [Exhibit U] When plaintiff is done traveling full-time, he

24 tentatively plans to return to Sioux Falls, likely as a Law Student.

25 **Conclusion**

26 This court has personal jurisdiction over Flex. Flex can be held accountable under the cause of action for advertising other company's products, and further because it contractually consented to

27 the same. Plaintiff IS a legitimate South Dakotan, and its laws should apply.

28

15

MOTION

**Certificate of Service**

This motion will be served onto Defendants' counsel through CM/ECF, and as stipulated by email.

/s/ Joshua A. Lapin
Joshua A Lapin
Pro Se Plaintiff 7/31/22
_____
  Signature