B218603

Court of Appeal of California, Second District

# Hypertouch, Inc. v. ValueClick, Inc.

192 Cal.App.4th 805 (Cal. Ct. App. 2011) · 123 Cal. Rptr. 3d 8

Decided Apr 12, 2011

No. B218603.

February 10, 2011. REVIEW GRANTED April 12, 2011

Appeal from the Superior Court of Los Angeles County, No. LC081000, Richard A. Adler, Judge.

806 *806

Steptoe Johnson, Richard K. Willard, Lawrence P. Riff and Lynn R. Levitan for Plaintiff and Appellant.

Gibson, Dunn Crutcher, Daniel M. Kolkey, Kevin Rosen and S. Ashlie Beringer for Defendants and Respondents ValueClick Inc., E-Babylon, Inc., Hi-Speed Media, Inc., VC E-Commerce Solutions, Inc., Webclients, Inc. and Commission Junction, Inc.

Kenoff Machtinger and Leonard S. Machtinger for
813 Defendant and Respondent PrimaryAds, Inc. *813

807 *807

808 *808

809 *809

810 *810

811 *811

812 *812

**OPINION**

ZELON, J. —

# INTRODUCTION

Appellant Hypertouch, Inc. (Appellant), filed an action alleging that ValueClick, Inc., various ValueClick subsidiaries and PrimaryAds, Inc. (Respondents), violated Business and Professions Code section 17529.5, subdivision (a), [1] which prohibits entities from advertising in a commercial electronic message (e-mail) that contains various types of deceptive content. Respondents moved for summary judgment, arguing that Appellant's claims were preempted by the "Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003" (CAN-SPAM Act or Act; 15 U.S.C. § 7701 et seq.) Alternatively, Respondents argued that (1) Appellant had failed to establish a triable issue of fact as to whether Respondents had violated section 17529.5, and (2) any claim predicated on an e-mail received more than one year prior to the filing of the complaint was barred by the one-year statute of limitations in Code of Civil Procedure section 340, subdivision (a).

[1] All further statutory references are to the Business and Professions Code, unless otherwise indicated.

The trial court granted summary judgment, ruling that the CAN-SPAM Act preempted Appellant's section 17529.5 claims. Although the Act expressly exempts from preemption state laws prohibiting "falsity or deception" in commercial e-mail, the court concluded this exemption was only intended to apply to state statutes that require a plaintiff to establish each element of common law

fraud. The court entered judgment dismissing the case in its entirety and awarded Respondents approximately $100,000 in costs.

On appeal, Appellant argues that the court erred in ruling that the CAN-SPAM Act preempts claims arising under section 17529.5. In addition, Appellant argues that (1) it introduced sufficient evidence to establish a triable issue of fact as to whether Respondents violated section 17529.5; (2) section 17529.5 claims are governed by the three-year statute of limitations in Code of Civil Procedure section 338, rather than the one-year period described in section 340, subdivision (a); and (3) the trial court abused its discretion in awarding Respondents $100,000 in costs.

We reverse the trial court's grant of summary judgment, concluding that the CAN-SPAM Act does not preempt Appellant's claims and that Respondents have failed to satisfy their initial burden to produce evidence showing the nonexistence of any triable issue of fact with respect to whether they violated section 17529.5.

814 *814

# FACTUAL AND PROCEDURAL BACKGROUND

I. *Description of the Parties*

A. *Appellant Hypertouch, Inc.*

Hypertouch, Inc., provides electronic mail service to approximately 100 customers located inside and outside of California, including Internet startup companies, corporations, charitable organizations and various people related to the president of Hypertouch, Joseph Wagner. Since its inception, Hypertouch's customers have received "massive quantities" of unsolicited commercial e-mail, commonly referred to as "spam." Some Hypertouch users have complained about "their spam load and the difficulties that it causes them." Hypertouch alleges that it has been forced to spend a considerable amount of money on "hardware and software as a direct result of the yearly increasing onslaught of spam e-mails."

B. *Respondent ValueClick, Inc., and Its Subsidiaries*

ValueClick and its subsidiaries (collectively ValueClick) provide online marketing services to third party advertisers who promote retail products. ValueClick contracts with these third party advertisers to place promotional offers on Web sites that are owned and operated by various ValueClick entities. Consumers, in turn, can visit ValueClick's Web sites and earn rewards in exchange for participating in the advertised promotional offers.

ValueClick contracts with thousands of independent "affiliates" to drive traffic to their Web sites through e-mail placements and other forms of advertising. ValueClick provides affiliates with the creative material associated with any given promotion. The affiliates, in turn, send out commercial e-mail advertisements that include a link redirecting the consumer to a promotion on ValueClick's Web sites. In many cases, the affiliates hire subaffiliates to conduct the e-mailing. Normally, each e-mail advertisement contains a tracking code indicating the affiliate or subaffiliate responsible for driving the consumer to ValueClick's Web site. If a consumer clicks through an e-mail advertisement and participates in a promotional offer, the affiliate or subaffiliate who sent the initial e-mail is then compensated for generating a customer "lead."

As a result of its business model, ValueClick has no knowledge of, or control over, the e-mail delivery methods or header information used by affiliates or their subaffiliates. *815

815

C. *Respondent PrimaryAds, Inc.*

Respondent PrimaryAds, Inc., is an online marketing service that owns and operates a private Web site containing creative content associated with numerous third party promotional offers. PrimaryAds contracts with a net-work of independent affiliates who download

advertisement materials from PrimaryAds's Web site and "utilize the . . . [advertisements] in [commercial] e-mails."

"When an affiliate places downloaded creative material in an e-mail . . . [consumers] may click on a link in the e-mail," which directs them to the PrimaryAds's Web site and then immediately redirects them to the third party advertiser's Web site which contains the promotional offer.[2] PrimaryAds, in turn, tracks which affiliate is responsible for driving traffic to the third party advertiser's offer page. If the consumer participates in the promotional offer, a tracking link notifies PrimaryAds, and the affiliate receives a commission. PrimaryAds is compensated by the third party advertiser each time a consumer participates in an offer.

> [2] The record is unclear whether PrimaryAds actually owns and operates any Web sites that contain promotional offers or simply contracts with third party advertisers to drive consumers (through the use of affiliates) to promotional Web pages owned by the third party advertisers.

Before providing access to its private Web site and allowing affiliates to e-mail its advertising materials, PrimaryAds requires each affiliate to sign a contract prohibiting it from issuing spam or violating any antispam laws. Like ValueClick, PrimaryAds alleges that it has "no control over the e-mail delivery methods used by affiliates."

## II. *Hypertouch's Complaint and the Trial Court Proceedings*

On April 3, 2008, Hypertouch filed a complaint against ValueClick, numerous ValueClick subsidiaries and PrimaryAds (collectively Respondents) alleging that, between April 2, 2004, and the date the action was filed, Respondents had advertised in over 45,000 e-mails received by Hypertouch customers that contained deceptive "header information" in violation of section

17529.5. The complaint also included a separate cause of action alleging Respondents had violated section 17200.

During discovery, Hypertouch produced thousands of e-mails that allegedly contained links to Respondents' promotional offers. According to Hypertouch, each e-mail also contained one of three categories of deceptive header information that violated section 17529.5. First, Hypertouch alleged that numerous e-mails contained "falsified" header information because the "From" or "To" fields did not accurately reflect the identity of the sender or *816 recipient of the e-mail. Second, Hypertouch alleged that the subject lines of many e-mails contained statements likely to mislead recipients into believing that they could obtain a free gift when, in fact, the gift could only be obtained by paying a fee or participating in additional promotional offers. Finally, Hypertouch alleged that some of the e-mails contained a "third-party's domain name without the permission of the third party."

Approximately 10 months after the case was filed, ValueClick filed a motion for summary judgment, which Primary Ads joined. ValueClick argued that Hypertouch's section 17529.5 claims were preempted by the CAN-SPAM Act, 15 United States Code section 7701 et seq., which contains a preemption clause barring any state statute "that expressly regulates the use of electronic mail to send commercial messages, except . . . any . . . statute . . . [that] prohibits falsity or deception in any portion of [an e-maij]." ( 15 U.S.C. § 7707(b)(1).) ValueClick argued that the exemption for state statutes prohibiting "falsity or deception" was only intended to permit state law claims based on all of the elements of common law fraud, including knowledge of falsity, intent to deceive, reliance and damages proximately caused by the misrepresentation. Respondents further argued that because Hypertouch had no evidence Respondents actually knew about the alleged e-mails or that any Hypertouch customer relied on or was harmed by the deceptive content in the e-

mails, its claims were necessarily preempted. Alternatively, ValueClick argued that it was entitled to summary judgment because the allegedly "deceptive" content in the e-mails did not violate the substantive prohibitions described in section 17529.5.

Primary Ads also filed a motion for summary judgment, which was accompanied by a motion for summary adjudication, raising two additional arguments. First, Primary Ads contended that section 17529.5 required the plaintiff to establish that the defendant actually sent or had knowledge of the unlawful e-mails, which Hypertouch had failed to do. Second, PrimaryAds argued that, pursuant to Code of Civil Procedure, section 340, it was entitled to summary adjudication on any claim predicated on an e-mail received more than one year prior to the filing of the action.

In its opposition, Hypertouch conceded that it could not establish all of the elements associated with common law fraud, but argued that section 17529.5 only required evidence that Respondents had "advertised" in e-mails containing any category of content prohibited by the statute. Hypertouch also argued that section 17529.5 was not preempted by the CAN-SPAM Act because it prohibited "falsity and deception," and therefore fell within the narrow exception recognized in the federal statute's preemption clause.

The trial court granted summary judgment in favor of ValueClick and PrimaryAds on all of Hypertouch's claims. The court first concluded 817 that, *817 under section 17529.5, Respondents could only be held liable for e-mails that they actually sent to Hypertouch customers. It further concluded that Hypertouch had only established that Respondents sent 24 of the 45,000 e-mails at issue and, as a result, those were the only e-mails at issue in the suit.

he court next considered whether the CAN-SPAM Act preempted Hypertouch's section 17529.5 claims and concluded that it did. The court agreed with Respondents' interpretation of the CAN-

SPAM Act, ruling that it barred any state laws regulating falsity or deception in commercial e-mails "unless such claims are for `common law fraud or deceit.'" The court further stated that "Plaintiff has [not] . . . adduced evidence . . . that any elements of fraud exist in this case. . . . [E]ven if the Court ignores all the other elements of fraud, Plaintiffs complaint is preempted by federal law since Plaintiffs complaint omits intent to deceive or intent to cause deception."

The court entered judgment in favor of Respondents and subsequently awarded Respondents approximately $100,000 in costs. Hypertouch filed a timely appeal of the trial court's judgment.

# DISCUSSION

This appeal raises three issues. First, we must determine whether the CAN-SPAM Act preempts claims arising under section 17529.5. Because we conclude that section 17529.5 is not preempted, we must next determine whether Hypertouch has established a triable issue of fact as to whether Respondents violated section 17529.5. Third, we must determine whether PrimaryAds is entitled to summary adjudication on any claim predicated on an e-mail that Hypertouch received more than one year prior to the filing of the complaint.

I. *Standard of Review*

"The standard for deciding a summary judgment motion is well-established, as is the standard of review on appeal." ( *Richard B. LeVine, Inc. v. Higashi* (2005) 131 Cal.App.4th 566, 572 [ 32 Cal.Rptr.3d 244].) "A defendant moving for summary judgment has the burden of producing evidence showing that one or more elements of the plaintiffs cause of action cannot be established, or that there is a complete defense to that cause of action. [Citations.] The burden then shifts to the plaintiff to produce specific facts showing a triable issue as to the cause of action or the defense. [Citations.] Despite the shifting burdens of production, the defendant, as the moving party, always bears the ultimate burden of persuasion as

to whether summary judgment is warranted. [Citation.]" ( *Garcia v. WW Community Development, Inc.* (2010) 186 Cal.App.4th 1038, 1041 [ 112 Cal.Rptr.3d 394] ( *Garcia*).) *818

"On appeal, we review de novo an order granting summary judgment. [Citation.] The trial court must grant a summary judgment motion when the evidence shows that there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. [Citations.] In making this determination, courts view the evidence, including all reasonable inferences supported by that evidence, in the light most favorable to the nonmoving party. [Citations.]" ( *Garcia, supra*, 186 Cal.App.4th at p. 1041.)[3]

> [3] The same standards apply to motions for summary adjudication. ( *see Haney v. Aramark Uniform Services, Inc.* (2004) 121 Cal.App.4th 623, 631 [ 17 Cal.Rptr.3d 336].)

## II. *Hypertouch's Section 17529.5 Claims Are Not Preempted by the CAN-SPAM Act*

A determination whether Hypertouch's claims are preempted by federal law requires an analysis of both section 17529.5 and the CAN-SPAM Act. (See generally *Gordon v. Virtumundo* (9th Cir. 2009) 575 F.3d 1040, 1047 ( *Virtumundo*) [interpreting breadth of Wn. State statute before determining whether preemption applied].)

### A. *Overview of Section 17529.5 and the CAN-SPAM Act*

1. Business and Professions Code section 17529.5

a. *Overview of Senate Bill No. 186 and section 17529.5*

In 2003, the California Legislature passed Senate Bill No. 186 (2003-2004 Reg. Sess.) (Senate Bill 186), which imposed broad restrictions on advertising in unsolicited commercial e-mail advertisements sent from or to a computer within California. (See § 17529 et seq.) According to the Legislature's "findings and declarations," the bill

was adopted to address the "skyrocket[ing] costs and "annoyance[s]" associated with "spam," which the statute defines as "unsolicited commercial e-mail advertisements."[4] (§ 17529, subds. (a)-(e).) The Legislature concluded that, to effectively regulate the abuses associated with spam, it was necessary to target not only the entities that send unsolicited commercial e-mail advertisements, but also the advertisers whose products and services are promoted in those e-mails: "Many *819 spammers have become so adept at masking their tracks that they are rarely found. . . . [¶] There is a need to regulate the advertisers who use spam, as well as the actual spammers, because the actual spammers can be difficult to track down. . . . [¶] The true beneficiaries of spam are the advertisers who benefit from the marketing derived from the advertisements." ( § 17529, subds. (i), (j) (k).)

> [4] "The term `SPAM' originated as the trademark name for a canned pre-cooked meat product manufactured by Hormel Foods Corporation. [Citation.) The e-mail-related connotation has its roots in a popular 1970 sketch by the British comedy troupe Monty Python's Flying Circus, in which the word `spam' is repeated to the point of absurdity. [Citation.] A waitress recites menu items, which, to the restaurant patrons' dismay, involve increasingly repetitive mention of SPAM, only to be periodically interrupted by a group of Vikings chanting a chorus about SPAM until normal dialogue is impossible. [Citation.] Thus, in the context of the Internet, `spam' has come to symbolize unwanted, and perhaps annoying, repetitious behavior that drowns out ordinary discourse." ( *Virtumundo, supra*, 575 F.3d at p. 1044, fn. 1.)

Although Senate Bill 186 includes a provision that prohibits the transmission of any "unsolicited commercial e-mail advertisement[s]" (see § 17529.2), the statute also prohibits certain

deceptive practices in commercial e-mail, which are enumerated in section 17529.5, subdivision (a):

"(a) It is unlawful for any person or entity to advertise in a commercial e-mail advertisement either sent from California or sent to a California electronic mail address under any of the following circumstances:

"(1) The e-mail advertisement contains or is accompanied by a third-party's domain name without the permission of the third party.

"(2) The e-mail advertisement contains or is accompanied by falsified, misrepresented, or forged header information. . . .

"(3) The e-mail advertisement has a subject line that a person knows would be likely to mislead a recipient, acting reasonably under the circumstances, about a material fact regarding the contents or subject matter of the message."

Section 17529.5, subdivision (b), in turn, contains an enforcement provision that permits the "Attorney General," "[a]n electronic mail service provider" or "[a] recipient of an unsolicited commercial e-mail advertisement" to "bring an action against any person or entity that violates any provision of this section." (§ 17529.5, subd. (b)(1) (A)(i)-(iii).)

Section 17529.5, subdivision (b) also lists the remedies available under the statute, which include "either or both of the following: [¶] (i) Actual damages. [¶] (ii) Liquidated damages of one thousand dollars ($1,000) for each unsolicited commercial e-mail advertisement transmitted in violation of this section, up to one million dollars ($1,000,000) per incident." (§ 17529.5, subd. (b) (1)(B).) The statute further provides, however, that if the court finds the "defendant established and implemented, with due care, practices and procedures reasonably designed to effectively prevent unsolicited commercial e-mail advertisements that are in violation of this section, the court shall reduce the liquidated damages . . .

to a maximum of one hundred dollars ($100) for each unsolicited commercial e-mail advertisement, or a maximum of one hundred thousand dollars ($100,000) per incident." (§ 17529.5, subd. (b) 820  (2).) ) *820

b. *Section 17529.5 does not include many elements associated with traditional common law fraud*

Like several other California consumer protection statutes targeting deceptive advertising practices, section 17529.5 dispenses with many of the elements associated with common law fraud, which normally requires the plaintiff to prove "'(a) [a] misrepresentation . . . ; (b) knowledge of falsity (or `scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.'" ( *Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638 [ 49 Cal.Rptr.2d 377, 909 P.2d 981]; *see Morgan v. ATT Wireless Services, Inc.* (2009) 177 Cal.App.4th 1235, 1255 [ 99 Cal.Rptr.3d 768] ["A claim based upon the fraudulent business practice prong of [section 17200] is `distinct from common law fraud.' "A [common law] fraudulent deception must be actually false, known to be false by the perpetrator and reasonably relied upon by a victim who incurs damages. None of these elements are required to state a claim for . . . relief under [section 17200]."'].) Section 17529.5 differs from common law fraud in at least three ways.

(i) *Section 17529.5 prohibits "advertising" in a deceptive commercial e-mail, rather than sending or initiating a deceptive e-mail*

First, unlike traditional common law fraud, section 17529.5 does not require the plaintiff to show that the defendant actually made a false or deceptive statement. ( *Perlas v. GMAC Mortgage, LLC* (2010) 187 Cal.App.4th 429, 434 [ 113 Cal.Rptr.3d 790] [fraud claim requires plaintiff to establish "'defendant represented to the plaintiff that an important fact was true [and that the] representation was false . . .'"]) Instead, section

17529.5 makes it unlawful for a person or entity "to advertise in a commercial e-mail advertisement" that contains any of the deceptive statements described in subdivisions (a)(1)-(3). Thus, by its plain terms, the statute is not limited to entities that actually send or initiate a deceptive commercial e-mail, but applies more broadly to any entity that advertises in those e-mails.

Other portions of the statute confirm that the Legislature did not intend the statute to apply solely to those entities that actually send or initiate a deceptive e-mail. For example, the legislative findings in section 17529 state that "[t]here is a need to regulate the advertisers who use spam . . . because the actual spammers can be difficult to track down . . ." and have become "adept at masking their tracks." (§ 17529, subds. (j), (i).) The Legislature further concluded that regulating advertisers, rather than merely the senders of spam, was necessary because they are the "true beneficiaries . . . who benefit from the marketing derived from the [spam] advertisements." (§ 17529, subd. (k).) *821

Similar statements appear throughout the legislative history. (See generally *In re Microsoft I-V Cases* (2006) 135 Cal.App.4th 706, 719 [ 37 Cal.Rptr.3d 660] ["Even when a statute is unambiguous, it is nevertheless common for a court to review legislative history in order to confirm its statutory analysis."].) For example, the Assembly Committee on the Judiciary's analysis of Senate Bill 186 includes a statement summarizing the purpose of the statute: "'[t]his bill will get at the real solution to unsolicited e-mails by allowing people to sue the advertisers of unsolicited e-mails. SB 186 seeks to get to the heart of the matter by penalizing the actual advertiser of the spam e-mails. . . . We need to go after the companies that are profiting by these e-mails and allow recipients to hold the advertisers financially responsible.'" (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 186 (2003-2004 Reg. Sess.) as amended June 26, 2003, p. 5.) Similarly, in a memo prepared for the Senate

Business and Professions Committee, the author of Senate Bill 186 explained that "[t]he real problem lies with the actual businesses whose products are advertised through these e-mails. Those companies are just as responsible if not more for these e-mails and need to be held accountable. They are profiting at the expense of the consumer." (Sen. Bus. Prof. Com., Background Information Sheet for Senate Bill No. 186 (2003-2004 Reg. Sess.), Apr. 7, 2003; see also *Armijo v. Miles* (2005) 127 Cal.App.4th 1405, 1415, fn. 5 [ 26 Cal.Rptr.3d 623] ["Background information requests are a proper source for ascertaining legislative intent"].)

In sum, both the text and legislative history of Senate Bill 186 make clear that section 17529.5 was intended to apply to entities that advertise in deceptive commercial e-mails, not only the spammers who send them.

### (ii) *Section 17529.5 does not contain a "scienter" element*

The second way in which section 17529.5 differs from traditional common law is that it does not include any "scienter" or intent requirement. Specifically, the statute does not contain "qualifying language such as `knowingly' or `intentionally[,]' . . . [which] indicates the [Legislature] . . . did not intend guilty knowledge or intent to be elements of a violation." ( *Margarito v. State Athletic Com.* (2010) 189 Cal.App.4th 159, 168 [ 116 Cal.Rptr.3d 888]; *see In re Marley* (1946) 29 Cal.2d 525, 529-530 [ 175 P.2d 832]; see also *Khan v. Medical Board* (1993) 12 Cal.App.4th 1834, 1844-1845 [ 16 Cal.Rptr.2d 385]; *Northern Wind v. Daley* (1st Cir. 1999) 200 F.3d 13, 19 ["As a general matter, scienter is not required to impose civil penalties for regulatory violations when the regulation is silent as to state of mind."].) Thus, like other California statutes prohibiting false or misleading business practices, the statute makes an entity strictly liable for advertising in a commercial e-mail that violates the substantive provisions described in *822

Hypertouch, Inc. v. ValueClick, Inc.   192 Cal.App.4th 805 (Cal. Ct. App. 2011)

section 17529.5, subdivision (a) regardless of whether the entity knew that such e-mails had been sent or had any intent to deceive the recipient. (See generally *Paduano v. American Honda Motor Co., Inc.* (2009) 169 Cal.App.4th 1453, 1468 [ 88 Cal.Rptr.3d 90] [explaining that § 17200 "'"'imposes strict liability' "'"]; *People ex rel. Van de Kamp v. Cappuccio, Inc.* (1988) 204 Cal.App.3d 750, 760-761 [ 251 Cal.Rptr. 657].)[5]

[5] We recognize that section 17529.5, subdivision (c) imposes criminal penalties for violating the statute's substantive prohibitions. The California Supreme Court has held that if a criminal statute imposes substantial penalties, there is "a presumption against criminal liability without mental fault or negligence, rebuttable only by compelling evidence of legislative intent to dispense with mens rea entirely." ( *In re Jorge M.* (2000) 23 Cal.4th 866, 879 [ 98 Cal.Rptr.2d 466, 4 P.3d 297], citing Pen. Code, § 20.) Regardless of whether subdivision (c) imposes a mens rea requirement for criminal violations of section 17529.5 (an issue we need not resolve here), that does not alter the fact that, for purposes of civil liability, the statute does not require such a showing. (See generally *People v. Forest E. Olson, Inc.* (1982) 137 Cal.App.3d 137, 140 [ 186 Cal.Rptr. 804] [rejecting defendant's argument that civil provisions of § 17500 should be read narrowly because statute also includes criminal provision].) Moreover, the Legislature added subdivision (c) two years after the original version of the law, which only provided for civil liability, was passed. As a result, subdivision (c) does not demonstrate that the Legislature intended the civil provisions to include a scienter element.

Although the Legislature chose to impose liability without regard to knowledge or intent, the statute's remedy provisions include a mechanism that allows a defendant to significantly reduce its liability if it can show that it adopted "practices and procedures reasonably designed to effectively prevent unsolicited commercial e-mail advertisements that are in violation of [section 17529.5]." ( § 17529.5, subd. (b)(2).) If the defendant makes such a showing, the trial court is required to "reduce the liquidated damages . . . to a maximum of . . . [$100 per e-mail or $100,000] per incident." ( § 17529.5, subd. (b)(2).) Thus, rather than facing mandatory liquidated damages of $1,000 per e-mail or $1 million per incident (see § 17529.5, subd. (b)(1)(B)(ii)), an entity that violates the statute despite its good faith effort to prevent deceptive commercial e-mail might only be subject to nominal liquidated damages. ( *see The TJX Companies, Inc v. Superior Court* (2008) 163 Cal.App.4th 80, 85-86 [ 77 Cal.Rptr.3d 114] ( *TJX Companies*) [statute imposing maximum penalty of $250 provided trial court discretion to impose "'range of penalties'" that "could span between a penny . . . to the maximum amounts authorized by the statute"].)

(iii) *Section 17529.5 does not require reliance or damages*

Finally, section 17529.5 differs from common law fraud in that it does not require the plaintiff to prove that it relied on the deceptive commercial e-mail message or that it incurred damages as a result of the deceptive message. ( *see Asis Internet Services v. Consumerbargaingiveaways,* *823 LLC* (N.D.Cal. 2009) 622 F.Supp.2d 935, 941 ( *Consumerbargaingiveaways*) ["Section 17529.5(a) does not . . . purport to require reliance or actual damages . . .,"].)[6]

[6] In addition, for violations of section 17529.5, subdivision (a)(3), the plaintiff need not prove actual falsity, but only that the offending statement was "likely to mislead" the recipient. (See § 17529.5, subd. (a)(3).)

2. *Overview of the CAN-SPAM Act*

a. *Summary of the CAN-SPAM Act's substantive provisions*

Shortly after California adopted Senate Bill 186, Congress enacted the CAN-SPAM Act, which, like Senate Bill 186, was passed "in response to mounting concerns associated with the rapid growth of spam e-mails." ( *Virtumundo, supra*, 575 F.3d at p. 1047.) The Act does "not ban spam outright, but rather provides a code of conduct to regulate commercial e-mail messaging practices. Stated in general terms, the CAN-SPAM Act prohibits such practices as transmitting messages with `deceptive subject headings' or `header information that is materially false or materially misleading.' [Citation.] The Act also imposes requirements regarding content, format, and labeling. For instance, unsolicited e-mail messages must include the sender's physical postal address, indicate they are advertisements or solicitations, and notify recipients of their ability to decline further mailings. [Citation.]" ( *Id.* at pp. 1047-1048.)

The Act's enforcement provision "empowers the Federal Trade Commission, state attorneys general, and other state and federal agencies to pursue legal actions to enforce the Act[]. . . . Congress also provided a limited private right of action, which states: A `provider of Internet access service adversely affected by a violation of [the prohibited acts] . . . `may bring a civil action in any district court' to enjoin further violation by a defendant or to recover either actual or statutory damages, whichever is greater." ( *Virtumundo, supra*, 575 F.3d at p. 1048, citations omitted.) Thus, unlike section 17529.5, the CAN-SPAM Act only provides a private cause of action to Internet service providers that have been "adversely affected" by prohibited commercial e-mails[7] and does not extend a cause of action to the recipients of such e-mails. *824

824

---

[7] The Ninth Circuit has interpreted the term "adversely affected" as limiting standing to "bona fide" Internet service providers who have experienced harm from spam that is "`both real and of the type uniquely experienced by IASS,'" and not simply "the

ordinary inconveniences experienced by consumers and end users." ( *Virtumundo, supra*, 575 F.3d at p. 1053, italics omitted.) Illustrative harms include "the cost of `investing in new equipment to increase capacity and customer service personnel to deal with increased subscriber complaints . . . [and] maintaining e-mail filtering systems and other anti-spam technology on their networks to reduce the deluge of spam'"; "`network crashes, higher bandwidth utilization, and increased costs for hardware and software upgrades, network expansion and additional personnel.'" ( *Ibid.*)

The substantive provisions of the Act prohibit any person from "initiat[ing] the transmission" of any commercial e-mail containing "header information that is materially false or materially misleading" or "a subject heading" that is "likely to mislead a recipient, acting reasonably under the circumstances, about a material fact regarding the contents or subject matter of the message." ( 15 U.S.C. § 7704(a)(1), (2).) The Act requires the plaintiff to prove that the defendant acted with knowledge and intent in some instances, but not others. For example, government entities seeking injunctive relief are not required to prove the defendant's "state of mind." ( 15 U.S.C. § 7706(e), (f)(2).) Internet service providers and state government agents seeking damages, however, must generally prove that the defendant acted with "actual knowledge" or consciously avoided knowledge of the statutory violations. ( 15 U.S.C. § 7706(f)(9), (g)(2).)

b. *The CAN-SPAM Act's preemption provision*

The CAN-SPAM Act includes a provision that expressly preempts state statutes that regulate the use of commercial e-mail "except to the extent that any such statute . . . prohibits falsity or deception in any portion of a commercial [e-mail]." ( 15 U.S.C. § 7707(b)(1).) The preemption clause reflects one of the primary goals of the CAN-SPAM Act: to regulate commercial

electronic mail "on a nationwide basis." ( 15 U.S.C. § 7701(b)(1).) As stated in the congressional findings accompanying the Act, the federal statute was intended to "to implement `one national standard' [citation]" regarding the content of commercial e-mail because "the patchwork of state laws had proven ineffective. . . ." ( *Virtumundo, supra*, 575 F.3d at pp. 1062-1063.)

The legislative history also makes clear, however, that the Act's preemption provision was largely intended to target state statutes imposing content requirements on commercial e-mails, while leaving states free to regulate the use of deceptive practices in commercial e-mails in whatever manner they chose. For example, the Senate report that accompanied the legislation states: "[the Act] supersedefs] State and local statutes . . . that expressly regulate the use of e-mail to send commercial messages except for statutes . . . that target fraud or deception in such e-mail. Thus, a State law requiring some or all commercial e-mail to carry specific types of labels, or to follow a certain format or contain specified content, would be preempted. By contrast, a State law prohibiting fraudulent or deceptive headers, subject lines, or content in commercial e-mail would not be preempted. . . . [I]n contrast to telephone numbers, e-mail addresses do not reveal the State where the holder is located. As a result, a sender of e-mail has no easy way to determine with which State 825 *825 law to comply. Statutes that prohibit fraud and deception in e-mail do not raise the same concern, because they target behavior that a legitimate business trying to comply with relevant laws would not be engaging in anyway." (Sen. Rep. No. 108-102, 1st Sess. (2003) [ 2003 WL 21680759; 2004 U.S.C.C.A.N. 2348].)

   B. *The CAN-SPAM Act Does Not Preempt Claims Arising Under Section 17529.5*

The trial court concluded that the CAN-SPAM Act's savings clause, which permits states to regulate "falsity or deception" in a commercial e-mail, only applies to state statutes that require the

plaintiff to establish every element of common law fraud. For the reasons that follow, we disagree with the trial court's interpretation of the CAN-SPAM Act and hold that the federal statute does not preempt state law claims arising under section 17529.5.

1. *General principles governing preemption*

"`Under the supremacy clause of the United States Constitution (art. VI, cl. 2), Congress has the power to preempt state law concerning matters that lie within the authority of Congress. [Citation.] In determining whether federal law preempts state law, a court's task is to discern congressional intent."' ( *Farm Raised Salmon Cases* (2008) 42 Cal.4th 1077, 1087 [ 72 Cal.Rptr.3d 112, 175 P.3d 1170] ( *Farm Raised Salmon*).) "Congress may indicate pre-emptive intent through a statute's express language or through its structure and purpose. [Citation.] If a federal law contains an express pre-emption clause, it does not immediately end the inquiry because the question of the substance and scope of Congress' displacement of state law still remains." ( *Altria Group, Inc. v. Good* (2008) 555 U.S. 70 ___, 1172 L.Ed.2d 398, 129 S.Ct. 538, 543] ( *Altria*).)

"Although the analysis of the scope of preemption begins with the text, `interpretation of that language does not occur in a contextual vacuum.' [Citation.] Rather, this inquiry is guided by two principles about the nature of preemption. First, there is a presumption against supplanting `the historic police powers of the States' by federal legislation `unless that [is] the clear and manifest purpose of Congress.' [Citation.]" ( *Virtumundo, supra*, 575 F.3d at p. 1060.) This "presumption against preemption" applies "with particular force" in the context of "`[c]onsumer protection laws'" that regulate "the prevention of deceptive sales practices." ( *Farm Raised Salmon, supra*, 42 Cal.4th at p. 1088.) As a result, we must give the express preemption clause a "`narrow interpretation'" ( *Virtumundo, supra*, 575 F.3d at p.

1060), and if the text "is susceptible of more than one plausible reading, . . . `accept the *826 reading that disfavors pre-emption.' [Citation.]" ( *Altria, supra*, 555 U.S. at p. [ 129 S.Ct. at p. 543].)

"Second, the preemption analysis is guided by the `oft-repeated comment . . . that the purpose of Congress is the ultimate touchstone in every preemption case.' [Citation.] `As a result, any understanding of the scope of a pre-emption statute must rest primarily on a fair understanding of *congressional purpose*,' and calls for courts to consider not only the language of the statute itself but also the `statutory framework' surrounding it and the `structure and purpose of the statute as a whole.' [Citations.]" ( *Virtumundo, supra*, 575 F.3d at p. 1060; see also *Altria, supra*, 555 U.S. at p. ___ [ 129 S.Ct. at p. 543].)

"It is with these principles in mind that we consider whether it was the `"clear and manifest purpose"` of Congress [citation] to preclude states from" regulating deceptive commercial e-mail messages in a manner that does not require proof of each and every element of common law fraud. ( *Farm Raised Salmon, supra*, 42 Cal.4th at p. 1088.)

2. *The language of the CAN-SPAM Act does not support the trial court's interpretation*

The preemption clause at issue states: "This chapter supersedes any statute, regulation, or rule of a State or political subdivision of a State that expressly regulates the use of electronic mail to send commercial messages, except to the extent that any such statute, regulation, or rule prohibits falsity or deception in any portion of a commercial electronic mail message or information attached thereto." ( 15 U.S.C. § 7707(b)(1).)

The savings clause does not reference either fraud or the common law, but rather permits any state law that prohibits "`falsity or deception in any portion of a commercial electronic mail message.'" ( *Asis Internet Services v. Subscriberbase Inc.*

(N.D.Cal., Apr. 1, 2010, No. 09-3503 SC) 2010 U.S.Dist. Lexis 33645, p. *38 ( *Subscriberbase*).) As a result, the text of the statute "betrays no intention by Congress to limit state regulation to the simple codification of common law fraud in its purest form." ( *Id.* at pp. *34-*35.) Congress "is certainly familiar with the word `fraud' and choose not to use it; the words `falsity *or* deception' suggest broader application." ( *Consumerbargaingiveaways, supra*, 622 F.Supp.2d at p. 942.)

Other sections of the CAN-SPAM Act indicate that the phrase "falsity and deception" was not intended to apply only to common law fraud. First, the provision that immediately follows 15 United State Code section 7707(b)(1)'s preemption clause states that, in addition to permitting state laws prohibiting *827 falsity or deception in commercial e-mails, the CAN-SPAM Act does not preempt "State laws that are not specific to electronic mail, including . . . tort law . . . or [¶] . . . other State laws to the extent that those laws relate to acts of fraud or computer crime." ( 15 U.S.C. § 7707(b)(2)(A) (B).) Interpreting the phrase "falsity or deception" to mean fraud, when the very next section of the statute actually uses the word fraud, would "contravene[] the principle that `when different words are used in contemporaneously enacted, adjoining subdivisions of a statute, the inference is compelling that a difference in meaning was intended.' [Citations.]" ( *Kleffman v. Vonage Holdings Corp.* (2010) 49 Cal.4th 334, 343 [ 110 Cal.Rptr.3d 628, 232 P.3d 625] ( *Kleffman*).)

Second, other provisions of the CAN-SPAM Act use the word "deceptive" in association with section 45 of the Federal Trade Commission Act (FTC Act; 15 U.S.C. § 41 et seq.), which is much broader than common law fraud. For example, 15 United State Code section 7704(a)(2) prohibits the use of "deceptive subject headings," which is defined as a subject heading that "would be likely to mislead a recipient . . . consistent with the criteria used in enforcement of section [45 of the

FTC Act]." Similarly, 15 United States Code section 7707(a)(2) clarifies that the CAN-SPAM Act does not affect the Federal Trade Commission's "authority to bring enforcement actions under [the] FTC Act for materially false or deceptive representations." Unlike common law fraud, to establish liability for deceptive statements under the FTC Act "[n]either proof of consumer reliance nor consumer injury is necessary to establish a . . . violation." ( *F.T.C. v. Freecom Communications, Inc.* (10th Cir. 2005) 401 F.3d 1192, 1203.) "[I]ntent to deceive" is also not required. ( *F.T.C. v. World Travel Vacation Brokers, Inc.* (7th Cir. 1988) 861 F.2d 1020, 1029.) The fact that other provisions of the CAN-SPAM Act "direct[] that the word `deceptive . . . ` . . . should be understood not as referencing common-law fraud . . . but rather deception as utilized in the FTC Act" ( *Consumerbargaingiveaways, supra,* 622 F.Supp.2d at p. 942), is a strong indication that the word "deception" in the preemption clause was not intended to refer to common law fraud. ( *see People v. Crowson* (1983) 33 Cal.3d 623, 633 [ 190 Cal.Rptr. 165, 660 P.2d 389] ["[i]t is . . . generally `presumed, in the absence of anything in the statute to the contrary, that a repeated phrase or word in a statute is used in the same sense throughout. [Citations.]' [Citation.]"], overruled on other grounds in *People v. Guerrero* (1988) 44 Cal.3d 343 [ 243 Cal.Rptr. 688, 748 P.2d 1150].)

Reading the phrase "falsity or deception" as encompassing something broader than common law fraud also finds support in the legislative history. The Senate Report accompanying the legislation stated that the CAN-SPAM Act would "supersede State and local statutes . . . that expressly regulate the use of e-mail to send commercial messages except for statutes . . . that target *fraud or deception* in such e-mail. . . . [A] State law prohibiting *fraudulent or deceptive* headers, subject lines, or content in commercial e-828 mail would not *828 be preempted." (Sen. Rep. No. 108-102, 1st Sess. (2003) [ 2003 WL 21680759; 2004 U.S.C.C.A.N. 2348], italics

added.) The Report further explains that although the purpose of the CAN-SPAM Act was to impose a single national standard on commercial e-mail content, the savings clause in the preemption provision reflected the Legislature's belief that "Statutes that prohibit *fraud and deception* in e-mail do not raise the same concern, because they target behavior that a legitimate business trying to comply with relevant laws would not be engaging in anyway." ( *Ibid.,* italics added.) Thus, in three separate instances, the report refers disjunctively to state law claims predicated on "fraud or deception." The Legislature's use of the "term `deception' would be redundant (if not misleading) if Congress meant to limit state regulation solely to common law fraud." ( *Subscriberbase, supra,* 2010 U.S.Dist. Lexis 33645 at p. *35.)

Finally, a review of the state laws in effect at the time Congress enacted the CAN-SPAM Act provides further support that the federal statute did not intend to "save" only those claims that were predicated on common law fraud. ( *see Hoang v. Reunion.com, Inc.* (N.D.Cal,, Mar. 31, 2010, No. C-08-3518 MMC) 2010 U.S.Dist. Lexis 34466, p. *17 ( *Reunion.com*).) Before the CAN-SPAM Act was passed, section 17529.5 was one of several state statutes in existence that imposed liability for the use of deceptive commercial e-mails regardless of whether the recipient actually relied on, or was damaged by, those misrepresentations. ( *see id.* at pp. *18-*19, citing Minn. Wn. State statutes; see also Kan. Stat. Ann. § 50-6, 107(c)(1) (A) (B); Ariz. Rev. Stat. § 44-1372.01.A.2.) Generally, when interpreting a statute, courts "presume that Congress is aware of the legal context in which it is legislating." ( *Abrego v. Dow Chemical Co.* (9th Cir. 2006) 443 F.3d 676, 684; see also *Albernaz v. United States* (1981) 450 U.S. 333, 341 [ 67 L.Ed.2d 275, 101 S.Ct. 1137] ["Congress is `predominantly a lawyer's body,' [citation], and it is appropriate for us `to assume that our elected representatives . . . know the law.' [Citation.]"].) We therefore must assume that, at the time the CAN-SPAM Act was passed,

Congress was aware that many states imposed liability for deceptive commercial e-mails without requiring reliance or other elements of common law fraud. Despite this knowledge, Congress chose not to use the word "fraud" in the savings provision, thereby suggesting that it intended the phrase "falsity or deception" to have a broader application.

### 3. *Permitting state law claims that lack elements of common law fraud does not undermine the CAN-SPAM Act's national standard*

Respondents argue that, regardless of the actual language of the preemption clause, permitting claims for misleading or deceptive statements in a commercial e-mail without requiring a plaintiff to 829 establish scienter, reliance *829 and proximate damages would frustrate the CAN-SPAM Act's central purpose, which was to impose a "national standard" for the content of commercial e-mails. (See generally *Virtumundo, supra*, 575 F.3d at p. 1063 ["We are compelled to adopt a reading of the preemption clause that conforms with the statute's structure as a whole and the stated legislative purpose."].)

We agree that the CAN-SPAM Act was intended to establish uniform standards for the content of commercial e-mail. The substantive provisions of the Act make clear that this "uniform standard" includes prohibitions on the use of " *materially* false or *materially* misleading header information," as well as deceptive subject lines that are likely to mislead the recipient of a commercial e-mail. ( *Virtumundo, supra*, 575 F.3d at p. 1062 ["the CAN-SPAM Act prohibits only *deceptive* subject line headings or *materially* false or *materially* misleading header information. [Citations.] Significantly, Congress intended this standard to regulate commercial e-mail messaging practices `on a nationwide basis.' [Citation.]" (fn. omitted)]; see also 15 U.S.C. § 7704(a)(1), (2).) The justification for the CAN-SPAM Act's preemptive effect, in turn, is to prevent state and local lawmakers from "manipulating] that standard" by broadening the scope of e-mail content that might subject a defendant to liability. ( *Virtumundo, supra*, 575 F.3d at p. 1063.)

The fact that California imposes liability for e-mails containing deceptive header information without requiring the traditional elements of fraud does not alter the "uniform standard" governing commercial e-mail content established under the CAN-SPAM Act. The elements of reliance and damages, for example, have nothing to do with the content of an e-mail. Whether those elements are present in any case depends not on the "substance of the e[-]mails or subject lines" at issue, but rather "upon the naivete, vulnerability, or circumstance of the recipient." ( *Subscriberbase, supra*, 2010 U.S.Dist. Lexis 33645 at p. *36.) Similarly, imposing strict liability for advertising in commercial e-mails that contain materially deceptive content does not alter the type of content that might subject a defendant to liability. Instead, it broadens the class of persons who may be held responsible for such content.

Rather than broadening the scope of prohibited content in commercial e-mail, California's decision to dispense with the elements of common law fraud was intended to create a more effective mechanism for eradicating the use of deceptive commercial e-mails. Section 17529.5 seeks to accomplish this goal in two ways. First, the statute permits a recipient of a deceptive commercial e-mail to bring suit regardless of whether they were actually mislead or harmed by the deceptive message. This ensures that the use of deceptive e-mail will not go unpunished merely because it failed to mislead its targets. Second, imposing 830 strict liability on the advertisers who *830 benefit from (and are the ultimate cause of) deceptive e-mails, forces those entities to take a more active role in supervising the complex web of affiliates who are promoting their products.[8] While the CAN-SPAM Act establishes a national standard for the content of commercial e-mail, that standard is simply not altered or frustrated by "allowing

Hypertouch, Inc. v. ValueClick, Inc.   192 Cal.App.4th 805 (Cal. Ct. App. 2011)

variation in laws governing who may bring suit" or who those suits may be brought against. ( *Asis Internet Services v. Member Source Media, LLC* (N.D.Cal., Apr. 20, 2010, No. C-08-1321 EMC) 2010 U.S.Dist. Lexis 47865, p. *10 ( *Member Source Media*).) As one federal court recently explained, the CAN-SPAM "authorized California to `prohibit . . . falsity or deception in any portion of a commercial electronic mail message,' 15 U.S.C. § 7707(b)(1), and it indicated no intent to limit the mechanisms that California may authorize to enforce such prohibitions." ( *Subscriberbase, supra*, 2010 U.S.Dist. Lexis 33645 at p. *38.)

> [8] The evidence in this case shows that online marketing service companies like ValueClick and PrimaryAds rely on thousands of affiliates and subaffiliates to drive consumers to their promotional offers and readily admit that, under the business model they have adopted, they have no knowledge of, or control over, the content of the e-mails used by affiliates or their subaffiliates.

Finally, although Respondents contend that section 17529.5 frustrates the CAN-SPAM Act by dispensing with the elements of reliance, proximate damages, or scienter, it overlooks the fact that, in many cases, the federal statute does not impose such requirements. For example, 15 United States Code section 7706(g)( 1) permits a "provider of Internet access service adversely affected" by commercial e-mail to bring an action for damages. The Act does not require that the IAS (Internet access service) demonstrate that it, or any of its customers, relied on or was harmed by the deceptive content in the e-mail.[9] In addition, the Act permits states to bring actions to enjoin the use of "materially false or materially misleading" header information without proving actual knowledge. ( 15 U.S.C. § 7704(a)(1).)[10] Similarly, the Federal Trade Commission and the states attorney generals may bring suit to enjoin the use of "a subject heading [that] would be likely

to mislead a recipient" without proving "state of mind." ( 15 U.S.C. §§ 7704(a)(2), 7706(e), (f)(2).) Thus, even under the CAN-SPAM Act, defendants may be subject to suit for deceptive subject lines and header information without regard to their knowl-edge or mental state, and regardless of whether anyone was actually deceived. *831

### 4. *Our holding is consistent with* Gordon v. Virtumundo *and* Omega World Travel, Inc. v. Mummagraphics

> [9] In *Virtumundo*, the Ninth Circuit held that an IAS can demonstrate an adverse effect by showing that the spam e-mail caused "`network crashes, higher bandwidth utilization, and increased costs for hardware and software upgrades.'" ( *Virtumundo, supra*, 575 F.3d at p. 1053.) None of these effects is related to the misleading nature of the e-mail.

> [10] The statute includes an affirmative knowledge requirement only when a state seeks monetary damages or when the suit is brought by an Internet service provider. ( 15 U.S.C. § 7706(f)(9), (g)(2).)

Respondents also argue that two federal circuit court decisions, *Virtumundo, supra*, 575 F.3d 1040, and *Omega World Travel, Inc. v. Mummagraphics* (4th Cir. 2006) 469 F.3d 348 ( *Omega*), have expressly held that the CAN-SPAM Act preempts "strict liability" claims pertaining to false or deceptive commercial e-mail content. In Respondents' view, these cases stand for the proposition that the CAN-SPAM Act preempts claims that do not impose a knowledge or intent requirement.

#### a. *Summary of* Omega *and* Virtumundo

In *Omega, supra*, 469 F.3d 348, the Fourth Circuit considered whether the CAN-SPAM Act preempted state claims for "immaterial errors" contained within the header of a commercial e-mail.[11] ( 469 F.3d at p. 353.) The court began its analysis by considering whether the term "falsity," as used in the CAN-SPAM Act's savings clause,

was intended to permit state law claims for any error or misstatement in a commercial e-mail. The court reasoned that because the term "falsity" had been paired with "deception," it necessarily implied "an element of tortiousness or wrongfulness, as in `deceitfulness, untrustworthiness, faithlessness'" ( 469 F.3d at p. 354), which went beyond mere error.

> 11   The alleged inaccuracies included, for example, the fact that the "from" address said "cruisedeals@cruise.com" even though Cruise.com had stopped using that address. ( *Omega, supra*, 469 F.3d at p. 351.)

The court then reviewed the structure and purpose of the CAN-SPAM Act as a whole, and "concluded that Congress could not have intended, by way of the carve-out language, to allow states to enact laws that prohibit `mere error' or `insignificant inaccuracies.'" ( *Virtumundo, supra*, 575 F.3d at p. 1061 [discussing and analyzing *Omega, supra*, 469 F.3d at pp. 354-355].) Specifically, the court noted that the CAN-SPAM Act provided a private cause of action for "`header information that is *materially* false or *materially* misleading,' suggesting that Congress only intended to "target[] . . . e-mails containing something more than an isolated error." ( *Omega, supra*, 469 F.3d at pp. 354, 355, original italics.) In the court's view, state laws providing a cause of action for "bare error" ( *id.* at p. 354) in a commercial e-mail would necessarily frustrate this "national standard" ( *id.* at p. 355).

In *Virtumundo, supra*, 575 F.3d 1040, the Ninth Circuit considered whether the CAN-SPAM Act preempted a state law claim alleging that the defendant sent commercial e-mails from domain names that "obscure[d] the identity of the sender." ( 575 F.3d at p. 1058.) The defendant, Virtumundo, Inc., had sent *832 the plaintiff commercial e-mails from several different domain names, including "vmmail.com," "vmadmin.com," "vtarget.com," and "vmlocal.com." ( *Id.* at p. 1064.) The plaintiff conceded that the domain

names were "properly registered to Virtumundo," but argued that they "fail[ed] to clearly identify Virtumundo as the e-mails' sender and therefore misrepresented] or obscure[d] the identity of the sender" in violation of Washington law. ( *Id.* at pp. 1064, 1063.)

Like the *Omega* court, the Ninth Circuit began its analysis by interpreting the meaning of the phrase "falsity or deception" as used in the CAN-SPAM Act's carve-out provision. After reviewing the text and history of the statute, the court agreed with *Omega's* conclusion that the phrase was not intended to permit states to "to create liability for immaterial inaccuracies or omissions." ( *Virtumundo, supra*, 575 F.3d at p. 1062.) The court explained that the CAN-SPAM Act specifically prohibited " *deceptive* subject line headings or *materially* false or *materially* misleading header information" and "intended this standard to regulate commercial e-mail messaging practices `on a nationwide basis.' [Citation.]" ( 575 F.3d at p. 1062, fn. omitted.) In the court's view, "[i]t would be logically incongruous to conclude that Congress endeavored to erect a uniform standard but simultaneously left states and local lawmakers free to manipulate that standard . . ." by imposing liability for inaccuracies that did not rise to the level of deception. ( *Id.* at p. 1063.)

The court further concluded that, under its interpretation of the Act, the plaintiffs claims for "obscured" domain names were necessarily preempted, explaining that "[t]here is . . . nothing inherently deceptive in Virtumundo's use of fanciful domain names." ( *Virtumundo, supra*, 575 F.3d at p. 1063.) As a result, the plaintiffs claims "relate[d] to, at most, non-deceptive statements or omissions" ( *id.* at p. 1064), and targeted "e-mail activity that is not unfair or deceptive" ( *id.* at p. 1063, fn. 21, italics omitted).

    b.   *Our holding is consistent with* Virtumundo *and* Omega

Hypertouch, Inc. v. ValueClick, Inc.   192 Cal.App.4th 805 (Cal. Ct. App. 2011)

Neither *Virtumundo* nor *Omega* decided the issue presented here: whether a state law that targets commercial e-mails containing deceptive content is preempted by the CAN-SPAM Act because it does not require the plaintiff to establish all elements of a traditional fraud claim. (See *Subscriberbase, supra*, 2010 U.S.Dist. Lexis 33645 at pp. *29-*33 *[Virtumundo* and *Omega* did not resolve whether the "CAN-SPAM Act spared section 17529.5 plaintiffs from pleading" all of the elements of common law fraud]; *Consumerbargaingiveaways, supra*, 622 F.Supp.2d at p. 943 *[Omega* "merely held that state laws were preempted insofar as they permitted claims for *immaterial* errors. . . . It did not hold . . . that *all* elements of common-law fraud were required or that any particular element other than materiality was *833 required to survive preemption." (citation omitted)].) Instead, those cases held that the "CAN-SPAM Act forbids state statutes that reach non-deceptive practices" in commercial e-mails, such as mere errors or immaterial misstatements. ( *Subscriberbase, supra*, 2010 U.S.Dist. Lexis 33645 at p. *31.) In other words, *Omega* and *Virtumundo* concluded that state statutes that broaden the scope of prohibited commercial e-mail content beyond the uniform standard established by the CAN-SPAM Act are preempted. As explained above, California's decision to remove the elements of common law fraud does not affect the type of statement that might subject a defendant to liability and, as a result, *Virtumundo's* and *Omega's* analyses are of limited relevance.

Respondents disagree, arguing that *Omega* specifically held that the CAN-SPAM Act preempts state law claims imposing "strict liability" for deceptive e-mail content. *Omega*, however, held that the federal statute preempts state law claims "imposing strict liability for insignificant inaccuracies" or "errors." ( *Omega, supra*, 469 F.3d at p. 355.) It did not hold that

Congress preempted state law claims that impose strict liability for commercial e-mails that contain materially deceptive content.[12]

> [12] *Omega* does contain language suggesting the court believed the savings clause was only intended to apply to common law fraud. ( *see Omega, supra*, 469 F.3d at pp. 353, 354-355 [noting that Okla. statute "seems to reach beyond common law fraud or deceit"].) These comments, however, were not relevant to the specific issue decided in the case, which was whether the CAN-SPAM Act's reference to "falsity and deception" was broad enough to encompass state law claims predicated on immaterial errors or inaccuracies. ( *Omega*, at p. 353 ["Whatever the precise scope of the Oklahoma provision might be, we cannot agree that [the plaintiffs'] action for immaterial errors survives preemption."].) As our Supreme Court has explained, "[a]n appellate decision is not authority for everything said in the court's opinion but only `for the points actually involved and actually decided.' [Citations.]" ( *Santisas v. Goodin* (1998) 17 Cal.4th 599, 620 [ 71 Cal.Rptr.2d 830, 951 P.2d 399].)

In sum, we conclude that the CAN-SPAM Act's savings clause applies to any state law that prohibits material falsity or material deception in a commercial e-mail regardless of whether such laws require the plaintiff to prove and plead each and every element of common law fraud. We find nothing in the Act suggesting that it was Congress's "`clear and manifest'" intention that the phrase "falsity and deception" should apply as narrowly as Respondents suggest. ( *Virtumundo, supra*, 575 F.3d at p. 1060; *see Altria, supra*, 555 U.S. at p. 1129 S.Ct. at p. 543].)[13] *834

> [13] Since *Omega* and *Virtumundo* were decided, several federal district courts have concluded that the phrase "falsity and deception" was not intended to apply only to state statutes that require the elements of fraud. ( *Subscriberbase, supra*, 2010

U.S.Dist. Lexis 33645 at pp. *27-*43; *Member Source Media, supra,* 2010 U.S.Dist. Lexis 47865 at pp. *3-*ll; *Reunion.com, supra,* 2010 U.S.Dist. Lexis 34466 at pp. *13-*21.) Two additional published district court decisions, both of which were decided before *Virtumundo,* reached a similar conclusion. (See *Consumerbargaingiveaways, supra,* 622 F.Supp.2d at p. 941; *Asis Internet Services v. Vistaprint USA, Inc.* (N.D.Cal. 2009) 617 F.Supp.2d 989, 992-994.) We are aware of only one district court decision that reached a contrary conclusion. ( *see Kleffman v. Vonage Holdings Corp.* (C.D.Cal., May 22, 2007, No. CV 07-2406 GAF(JWJx)) 2007 U.S.Dist. Lexis 40487, pp. *8-*10; see also *Asis Internet Services v. Optin Global, Inc.* (N.D.Cal., Apr. 29, 2008, No. C-05-05124 JCS) 2008 U.S.Dist. Lexis 34959, p. *58 ( *Optin)* [stating, without any analysis, that "the savings clause of the CAN-SPAM Act . . . permits state law to regulate the use of electronic messages only to the extent those regulations are based on traditional principles of fraud"].)

III. *Respondents Have Not Demonstrated an Entitlement to Summary Adjudication Concerning Hypertouch's Section 17529.5 Claim*

Because the CAN-SPAM Act does not preempt claims arising under section 17529.5, we must review Respondents' alternative argument that summary judgment is appropriate because Hypertouch failed to establish a triable issue of fact as to whether Respondents violated section 17529.5. Respondents argue that they are entitled to summary judgment on Hypertouch's section 17529.5 claim for two reasons. First, they argue that Hypertouch failed to establish that Respondents sent or had any knowledge of the offending e-mails. Second, Respondents argue that the allegedly "deceptive" content of the e-mails did not violate the substantive prohibitions described in section 17529.5.

A summary judgment may be granted only where it is shown that the entire "action" has no merit. (Code Civ. Proc. § 437c, subd. (a).) Therefore, if there is a triable issue of fact regarding any portion of Hypertouch's section 17529.5 claim, summary judgment must be denied.

A. *Hypertouch Is Not Required to Demonstrate That Respondents Sent or Had Knowledge of the Offending E-mails*

Respondents first argue that summary judgment is appropriate because Hypertouch has failed to identify any evidence establishing that Respondents "sent the e-mails at issue," or "knew" that an affiliate was sending e-mail advertisements containing content prohibited under section 17529.5.[14]

[14] The trial court apparently agreed with these arguments. Its order granting summary judgment states: "at the outset, while the Complaint alleges that Defendants sent 45,000 e-mails, Plaintiff can identify no more than 2[4] coming from Defendants. . . . [¶] . . . [¶] . . Thus, instead of exposure to damages of $45 million, . . . [Respondents' exposure] . . . is no more than $24,000." Thus, it appears the court concluded that section 17529.5 only applies to individuals who actually "send" the offending e-mail.

As discussed above, the plain text of section 17529.5 indicates that its application is not limited to entities that "send" the offending e-mails nor does it require the plaintiff to establish that the defendant had knowledge of such e-mails. Rather, the statute imposes liability on any "person or entity" *835 that "advertise[s]" in an e-mail containing any of the forms of deceptive content described in section 17529.5, subdivision (a)(1)-(3). The legislative findings make clear that the statute was specifically intended to apply to "the advertisers who use spam, as well as the actual spammers" because "the actual spammers can be difficult to track down . . ." and "[t]he true beneficiaries of spam are the advertisers. . . ." (§ 17529, subds. (j), (k).)

Hypertouch, Inc. v. ValueClick, Inc.   192 Cal.App.4th 805 (Cal. Ct. App. 2011)

Therefore, for purposes of section 17529.5, the relevant question is not whether Hypertouch can demonstrate that Respondents sent or had knowledge of the e-mails, but rather whether they advertised in those e-mails.[15] In this case, the evidence raises a triable issue of fact as to whether Respondents advertised in some or all of the e-mails received by Hypertouch.

[15]  We are aware that at least one district court has reached a different conclusion. In *Optin, supra*, 2008 U.S.Dist. Lexis 34959, the trial court granted summary judgment on claims arising under the CAN-SPAM Act and section 17529.5 because the plaintiff had failed to identify any evidence indicating the defendant either knew deceptive e-mails were being sent or consciously avoided discovering that such acts were being committed. The trial court read an affirmative knowledge element into section 17529.5 because, in its view, the CAN-SPAM Act only permits states to regulate e-mail "to the extent those regulations are based on traditional principles of fraud." (2008 U.S.Dist. Lexis at pp. *58-*59.) As explained in detail above, we disagree with the court's interpretation of the preemption clause and, as a result, find no basis for reading a knowledge element into section 17529.5.

The record demonstrates that Respondents market and advertise third party promotional offers. To increase participation in these offers, Respondents contract with "affiliates" that send commercial e-mails containing links to the offers. If a consumer opens the e-mail, and ultimately chooses to participate in the promotional offer, Respondents pay the affiliate a fee for generating a consumer lead. Hypertouch's evidence snowed that at least some portion of the e-mails it received contained a link redirecting the consumer to Respondents' promotional materials. Moreover, Respondents admitted that thousands of these e-mails were sent by their affiliates. We believe this evidence is

sufficient to raise a triable issue of fact as to whether Respondents "advertised" in the e-mails at issue.[16]

B. *Respondents Have Failed to Carry Their Burden with Respect to Whether the Content of the E-mails Violated Section 17529.5*

[16]  The record contains additional evidence filed under seal pertaining to this triable issue and, as a result, it is not discussed here.

Respondents next contend that they are entitled to summary judgment because Hypertouch has failed to establish a triable issue of fact as to whether the e-mails at issue in this suit contained content that violates the substantive prohibitions described in

836   section 17529.5, subdivision (a). *836

Hypertouch has asserted three different categories of section 17529.5 violations. First, it alleges that Respondents violated section 17529.5, subdivision (a)(1) by advertising in e-mails that contained a third party's domain name without the permission of the third party. Second, it alleges that Respondents violated section 17529.5, subdivision (a)(2) by advertising in e-mails that included fictitious names in the "From" and "To" fields. Third, it alleges that Respondents violated section 17529.5, subdivision (a)(3) by advertising in e-mails that contained false and misleading subject lines.[17] For the reasons that follow, we conclude that Respondents have failed to satisfy their initial burden to produce evidence showing the nonexistence of any triable issue of material fact as to whether they violated subdivision (a)(3).[18] (See *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [ 107 Cal.Rptr.2d 841, 24 P.3d 493] ( *Aguilar*) [moving party has "initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact"].)

17  Hypertouch's complaint described a fourth category of claims alleging that numerous e-mails "arrived at the Hypertouch servers containing or accompanied by false information concerning the identities of the computers sending the e-mails." Specifically, Hypertouch alleged that the e-mail sender provided a false "HELO," which the complaint describes as "a parameter typically showing the computer's name and/or IP address so as to identify to the recipient computer who is sending the e-mail and where it came from." At the trial court, ValueClick argued that, in addition to being preempted, claims predicated on a false HELO were not cognizable under section 17529.5. Hypertouch's opening appellate brief makes no mention of its "HELO" claim. ValueClick's appellate brief, in turn, specifically references the fact that Hypertouch's opening brief did not mention its "HELO" claim and asserts the claim has therefore been waived. Hypertouch's reply brief does not respond to this argument and again makes no mention of its HELO claims. Because Hypertouch has neither referenced its "HELO" claim, or responded to Respondents' argument that it has waived such claims, we treat the claim as waived. (See generally *Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 684 [71 Cal.Rplr.3d 775].)

18  In the trial court and on appeal, Respondent ValueClick has asserted that it is entitled to summary judgment because the e-mails did not contain "deceptive" content within the meaning of section 17529.5. Primary Ads, however, has sought summary judgment and, in the alternative, summary adjudication, on Hypertouch's section 17529.5 claim. A motion for summary judgment can only be granted where it is shown that the entire "action has no merit." (Code Civ. Proc., § 437c, subd. (a).) A motion for summary adjudication can only be granted if it "completely disposes of a cause of action." ( *Id.*, subd.

(f)(1).) Hypertouch's complaint includes one cause of action alleging that Respondents violated section 17529.5 (in addition to a § 17200 claim). Because we conclude Respondents have failed to carry their initial burden of production to show the nonexistence of any triable issue of fact as to whether they violated section 17529.5 subdivision (a)(3), we need not address Respondents' alleged violations of subdivision (a)(1) or (2).

### 1. *Summary of alleged violations of section 17529.5, subdivision (a)(3)*

Hypertouch has alleged that numerous e-mails at issue in this suit violate section 17529.5, subdivision (a)(3), which prohibits the use of "a subject line *837 that a person knows would be likely to mislead a recipient, acting reasonably under the circumstances, about a material fact regarding the contents or subject matter of the message." Hypertouch identified numerous e-mails that contain subject lines purportedly offering the recipient free products or merchandise. Representative subject lines include: "Get a FREE Golf Retreat to 1 of 10 destinations"; "Let us know your opinion and win a free gift card"; "Do you think Hillary will win? Participate now for a Visa gift card"; "which would you choose? win a free gift card for letting us know." Hypertouch contends that, in fact, in order to procure such items the recipient was required to spend money or sign up for another offer of products or services promoted on Respondents' Web sites.

In support of these allegations, Hypertouch's president provided deposition testimony that, after receiving some of these e-mails, he clicked on a link that took him to a promotion page demonstrating that "in order to receive [the advertised free item] you have to . . . purchase from one these offers . . . I do not recall ever seeing an offer for an incentive award . . . that did not require a purchase or other obligation."

837

2. *Respondents have failed to satisfy their initial burden to produce evidence showing the nonexistence of any triable issue of material fact*

Respondents allege that they are entitled to summary judgment on Hypertouch's subdivision (a)(3) claims for three reasons, all of which lack merit.

a. *The language of subdivision (a)(3) encompasses claims alleging the subject line is likely to mislead consumers about the terms and conditions of an offer*

First, Respondents argue that "to violate [subdivision (a)(3)] an e-mail's subject line must suggest that the contents of the e-mail will concern one topic (e.g., great to see you, suggesting a personal message), when in fact, the contents or subject matter of the message relate to an entirely different topic (e.g., an advertisement.)" Respondents further contend that, in this case, "the subject lines and corresponding advertisements in the e-mails at issue here . . . concern *precisely the same subject matter*, both promote incentive rewards for participating in the offers contain on promotional websites." In other words, Respondents argue that subdivision (a)(3) has no application where the subject line creates the false impression that the recipient may receive a free gift when, in fact, the contents of the e-mail reveal that is untrue.

We reject Respondents' narrow reading of the statute. The plain text of the statute states it is unlawful to advertise in a commercial e-mail that 838 has *838 a "subject line" that "would be likely to mislead a recipient . . . about a material fact regarding the contents or subject matter of the message." (§ 17529.5, subd. (a)(3).) If a subject line creates the impression that the content of the e-mail will allow the recipient to obtain a free gift by doing one act (such as opening the e-mail or participating in a single survey), and the content of the e-mail reveals that the "gift" can only be obtained by undertaking more onerous tasks (such

as paying money for the gift or agreeing to partake in other offers), the subject line is misleading about the contents of the e-mail. We find no merit in Respondents' narrow interpretation of the statutory language.

b. *Respondents have failed to carry their initial burden to show that the terms of the offer were consistent with representations in the subject line*

Respondents also argue that they are entitled to summary judgment be-cause Hypertouch has identified " *no evidence* that individuals were required to pay anything to receive any promotional item offered." Thus, Respondents contend that Hypertouch has failed to establish that consumers were actually required to pay money to obtain the "free" gift advertised in the subject line of the e-mail. This argument fails, however, because Respondents have failed to carry their initial burden of production, as required under summary judgment procedures.

It is well established that, as the party moving for summary judgment, Respondents had the "initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact." ( *Aguilar, supra*, 25 Cal.4th at p. 850.) "A prima facie showing is one that is sufficient to support the position of the party in question." ( *Id.* at p. 851.) To satisfy its initial burden, a defendant must "present evidence . . . and not simply point out that the plaintiff does not possess, and cannot reasonably obtain, needed evidence." ( *Id.* at p. 854, fn. omitted.) The defendant may satisfy this requirement in one of two ways: First, it may "present evidence that conclusively negates an element of the plaintiffs cause of action." ( *Id.* at p. 855.) In the alternative, defendant "may . . . present evidence that the plaintiff does not possess, and cannot reasonably obtain, needed evidence — as through admissions by the plaintiff following extensive discovery to the effect that he has discovered nothing." ( *Ibid.*)

Hypertouch, Inc. v. ValueClick, Inc.   192 Cal.App.4th 805 (Cal. Ct. App. 2011)

In this case, Respondents have pointed to no evidence in the record, such as a declaration or deposition testimony, demonstrating that the offers at issue did not require participants to provide money to obtain the "free" gift referenced in the subject line. Instead, its brief cites to two pieces of evidence that, in its estimation, demonstrate 839 Hypertouch does not possess, and cannot *839 reasonably obtain, evidence "that individuals were required to pay anything to receive any promotional item offered." The first piece of evidence is an admission by Hypertouch that " [n]either Plaintiff or any of its end users ever attempted to participate in these offers." This admission, however, only demonstrates that Hypertouch never actually tried to fulfill whatever requirements were necessary to obtain a free gift. It does not demonstrate that the terms of those offers did not require the participant to pay a fee to obtain the advertised gift.

The second piece of evidence Respondents cite is deposition testimony in which Hypertouch's president stated that he could not recall whether "consumers could obtain the incentive reward identified in [the] `Subject line' . . . if they participated in the corresponding offer." Again, this evidence does not establish that the terms of the offer permitted the consumer to obtain a free gift without paying a fee. Rather, the statement only indicates that Hypertouch was unaware whether a consumer could obtain the advertised gift if it actually fulfilled whatever terms were required.

Because Respondents have identified no evidence negating Hypertouch's allegation that individuals were actually required to pay money to obtain the "free" gifts referenced in the subject line of the e-mails, it has not carried its initial burden.

c. *Respondents have failed to carry their initial burden to show that the subject lines were not likely to mislead*

Finally, Respondents argue that they are entitled to summary judgment on Hypertouch's section 17529.5, subdivision (a)(3) claim because the subject lines at issue are not "likely to mislead" the recipient.

The "likely to mislead" language in section 17529.5, subdivision (a)(3) is "virtually identical" to the standard that is used in applying other consumer protection laws that target false or deceptive advertisements, including sections 17200 and 17500. ( *Kleffman, supra*, 49 Cal.4th at p. 343 ["the language in section 17529.5, subdivision (a)(3) . . . is virtually identical to the language that, only months before section 17529.5's passage, a California appellate court announced for applying sections 17500 and 17200"].) It is well established that whether a statement is "likely to deceive" a reasonable consumer is "generally a question of fact." ( *Linear Technology Corp. v. Applied Materials, Inc.* (2007) 152 Cal.App.4th 115, 134 [ 61 Cal.Rptr.3d 221]; see *Consumer Advocates v. Echostar Satellite Corp.* (2003) 113 Cal.App.4th 1351, 1361 [ 8 Cal.Rptr.3d 22].) "`[T]he primary evidence'" in such cases "`is the advertising itself.'" ( *Brockey v. Moore* (2003) 107 Cal.App.4th 86, 100 [ 131 Cal.Rptr.2d 746].) 840 Therefore, to establish summary *840 judgment, Respondents must establish that no reasonable trier of fact could conclude that any of the subject lines were likely to mislead a recipient, acting reasonably under the circumstances.

The numerous subject lines at issue in this suit contain a wide variety of different statements. Some simply state that the recipient of the e-mail can get a free gift ("Get a $300 gift card FREE"; "Get a FREE Golf Retreat to 1 of 10 destinations"), others suggest that the recipient can obtain something free for doing a particular task ("Let us know your opinion and win a free gift card"; "Do you think Hillary will win? Participate now for a Visa gift card"), while still others contain a variety of phrases that might indicate to the recipient that there are terms and conditions

that must be fulfilled to obtain the gift ("Let us buy you a designer department store gift card. Participate now"; "Participate to receive a Holiday iPhone! (See offer for details)").

Respondents have made no effort to explain why a reasonable trier of fact could not conclude that many of the subject lines at issue here, such as those offering a free gift card with no qualifying language, would be likely to mislead a reasonable person. Instead, they target isolated e-mails in the record, such as one e-mail with the subject line "GAP Promotion," and argue that those particular e-mails are, as a matter of law, not deceptive. Regardless of whether Respondents are correct that the isolated e-mails they cite are not likely to mislead the recipient, that alone does not entitle them to summary judgment on Hypertouch's section 17529.5, subdivision (a)(3) claim, which includes many other subject lines that Respondents do not address.

IV. *Respondents are Not Entitled to Summary Adjudication Based on the Statute of Limitations*

Finally, PrimaryAds argues that, pursuant to Code of Civil Procedure section 340, subdivision (a), which prescribes a one-year limitations period for "[a]n action upon a statute for a penalty or forfeiture," it is entitled to summary adjudication on any claim that is predicated on an e-mail received more than one year prior to the filing of this action. Hypertouch disagrees, arguing that claims arising under section 17529.5 are governed by Code of Civil Procedure section 338, subdivision (a), which prescribes a three-year limitations period for "an action upon a liability created by statute, other than a penalty or forfeiture."

Section 17529.5, subdivision (b)(1)(B) provides that a person or entity bringing an action for claims arising under the section "may recover either or both of the following:

841  "(i) Actual damages. *841

"(ii) Liquidated damages of one thousand dollars ($1,000) for each unsolicited commercial e-mail advertisement transmitted in violation of this section, up to one million dollars ($1,000,000) per incident." Hypertouch's complaint, in turn, seeks recovery under both provisions.

In *G.H.I.I. v. MTS, Inc.* (1983) 147 Cal.App.3d 256 [ 195 Cal.Rptr. 211] ( *G.H.I.I.*), the court analyzed whether Code of Civil Procedure section 340 applied in the context of a statutory scheme that, like section 17529.5, contains independent provisions for recovery of actual damages and statutory damages. The plaintiff in *G.H.I.I.* asserted violations of the Unfair Practices Act (§ 17000 et seq.), which provides for the award of actual damages in one section (§ 17070), and treble damages in another section (§ 17082). Both forms of recovery are required "if a violation of the [act] is established." ( *G.H.I.I., supra*, 147 Cal.App.3d at p. 277.) In other words, the act does not require a plaintiff to make any additional showing to obtain treble damages; such damages attach upon establishing a statutory violation.a

The appellant argued that, under the statutory scheme, a "two-fold statute of limitations" applied: "the one-year period [in Code of Civil Procedure section 340] to the claim for treble damages, and the three-year period [in Code of Civil Procedure section 338] to the recovery of actual damages." ( *G.H.I.I., supra*, 147 Cal.App.3d at p. 278.) The court agreed, concluding that different statute of limitations may apply where the plaintiff seeks "actual and treble damages . . . based upon separate statutes contained within the same act." ( *Id.* at p. 278.) The court further concluded that, for the purposes of the Unfair Practices Act, a different statute of limitations did apply to recovery of actual damages versus recovery of treble damages: "Appellants claim compensatory damages pursuant to section 17070, and request trebling of those damages in accordance with section 17082. Since these claims are patently severable, and the actual damages are not in the nature of a `penalty or forfeiture,' we

conclude that appellants are entitled to recover all actual damages which accrued within three years of the filing of the complaint, and that all of such damages which accrued within *one* year prior to the filing of the complaint may be trebled under section 17082." ( 147 Cal.App.3d at p. 279.)

In *Menefee v. Ostawari* (1991) 228 Cal.App.3d 239 [ 278 Cal.Rptr. 805] ( *Menefee*), the court approved *G.H.I.I.*' s analytical framework, explaining that "[c]ertain statutory schemes contain separate, independent statutory provisions for recovery of actual damages and treble damages. [Citation.] In such case, a claim for actual damages under one statute will be governed 842 by a *842 different statute of limitations than section 340, subdivision (1), which will govern the claim for treble damages." ( *Id.* at p. 243; see also *Ashland Oil Co. v. Union Oil Co.* (T.E.C.A. 1977) 567 F.2d 984, 990-992 ( *Ashland Oil*) [applying Cal. law and reaching same conclusion].)

Based on the holdings in *G.H.I.I.* and *Menefee*, we must independently assess the appropriate statute of limitations applicable to Hypertouch's claims under section 17529.5, subdivision (b)(1)(B)(i), which permits the plaintiff to recover "[a]ctual damages," and subdivision (b)(1)(B)(ii), which permits the plaintiff to recover "[liquidated damages" in the amount of $1,000 per e-mail or $1 million per incident. Section 17529.5 shares essentially the same structure as the statutory provisions at issue in *G.H.I.I.* First, a plaintiff that elects to seek both actual and liquidated damages is entitled to both forms of recovery if it establishes a statutory violation. ( *G.H.I.I., supra,* 147 Cal.App.3d at p. 277 [Unfair Practices Act requires award of actual and treble damages "if a violation of the [act] is established"].) Second, claims seeking actual versus liquidated damages are "patently severable" ( 147 Cal.App.3d at p. 279), as evidenced by the fact that the plaintiff may elect to seek "either or both" forms of recovery. (§ 17529.5, subd. (b)(1)(B).)

Under *GH.I.I.'s* framework, we conclude that Hypertouch's claim for "actual damages" under section 17529.5, subdivision (b)(1)(B)(i), which is clearly not in the nature of a penalty or forfeiture, is controlled by the three-year limitations period described in Code of Civil Procedure section 338, subdivision (a). Thus, Hypertouch may pursue actual damages for any e-mail it received three years prior to the filing of its complaint.

We next construe the proper statute of limitations applicable to Hypertouch's claims for liquidated damages under section 17529.5, subdivision (b)(1)(B)(ii). The "`settled rule'" in California is that statutes which provide for damages that are in "`addition[] to actual losses incurred'" ( *Menefee, supra,* 228 Cal.App.3d at p. 243), or "not based upon actual injury" ( *Montalti v. Catanzariti* (1987) 191 Cal.App.3d 96, 98 [ 236 Cal.Rptr. 231]), are generally "`considered penal in nature [citations], and thus governed by the one-year period of limitations stated in section 340, subdivision (1).' [Citation.]" ( *Menefee, supra,* 228 Cal.App.3d at p. 243.) However, Code of Civil Procedure section 340 does not apply if the award of a penalty is discretionary, rather than mandatory. (See generally *Jensen v. BMW of North America, Inc.* (1995) 35 Cal.App.4th 112, 133 [ 41 Cal.Rptr.2d 295] ( *Jensen*) ["Code of Civil Procedure section 340, subdivision (1), applies only where the penalty is mandatory. . . . The key question is whether the penalty is mandatory or discretionary . . . ." (citation 843 omitted)]; *Menefee, supra,* *843 228 Cal.App.3d at p. 243.)[19] Applying those principles here, we conclude that Hypertouch's claim for liquidated damages under section 17529.5, subdivision (b)(1)(B)(ii) is subject to section 340's one-year limitations period.

---

19   A federal court of appeals has rejected this "discretionary/mandatory" dichotomy, concluding that "[t]he preponderance of California law establishes that an award in excess of compensatory damages, whether discretionary or not, is to be considered a

penalty for the purposes of its limitations statute." ( *Ashland Oil, supra,* 567 F.2d at p. 993.) Our courts, however, have continued to hold that discretionary penalties are not subject to Code of Civil Procedure section 340. (See, e.g., *TJX Companies, supra,* 163 Cal.App.4th at p. 85 ["[i]n determining which statute of limitations applies, `[t]he key question is whether the penalty is mandatory or discretionary . . .'"].) For the purposes of this case, the distinction is irrelevant because, as discussed below, we conclude that the award of liquidated damages under section 17529.5 is mandatory.

The liquidated damages described in section 17529.5 have several features indicating that they are penal in nature. First, section 17529.5 provides that liquidated damages are to be awarded in addition to actual losses. ( *Menefee, supra,* 228 Cal.App.3d at p. 243 ["statutes which provide for mandatory recovery of damages additional to actual losses incurred . . . are considered penal in nature . . ."]; *G.H.I.I., supra,* 147 Cal.App.3d at p. 277.) The fact that the Legislature allowed a plaintiff to "recover `either or both' of actual damages and statutory damages" indicates "that the two kinds of damages are different and thus logically serve different purposes: compensatory in the case of the former and penal in the case of the latter." ( *Phillips v. Netblue, Inc.* (N.D.Cal., Dec. 12, 2006, No. C-05-4401 SC) 2006 U.S.Dist. Lexis 92573, p. *16 ( *Netblue);* see also *Hypertouch, Inc. v. Azoogle.com, Inc.* (9th Cir., July 9, 2010, No. 09-15943) 386 Fed.Appx. 701 [ 2010 U.S.App. Lexis 14121, p. *4] ( *Azoogle.com)* [finding liquidated damages provision to be penalty because they may be awarded "in addition to actual damages"].)

Second, nothing in the text of the statute indicates that the amount of the liquidated damages — $1,000 per e-mail or $1 million per incident — is in any way based on the actual injury suffered by the entity seeking redress. ( *Netblue, supra,* 2006 U.S.Dist. Lexis 92573 at pp. * 16 — * 17

["calculation of statutory damages [under section 17529.5, subdivision (b)(1)(B)(i)] is completely independent of any determination regarding actual damages"]; *Azoogle.com, supra,* 2010 U.S.App. Lexis 14121 at p. *4 ["An award of liquidated damages under § 17529.5(b)(1)(B)(ii) has no relation to the amount of damages . . ."].) Indeed, the legislative history specifically states that the liquidated damages provision was intended to allow a plaintiff to recover more than its actual damages: "`In addition to actual damages (likely to be small in many such suits) the bill permits the plaintiff to seek liquidated damages. . . .' [Citation.]" ( *Netblue, supra,* 2006 U.S.Dist. Lexis 92573 at p. *17, quoting Assem. Com. on ⁸⁴⁴ Judiciary, Analysis of Sen. Bill 186, as *844 amended June 26, 2003.) Because the liquidated damages described in section 17529.5, subdivision (b)(1)(B)(ii) are awarded in addition to the plaintiffs actual damages, and their amount has no apparent connection to the injury suffered by the plaintiff, they are in the nature of a penalty.

Hypertouch, however, contends that the award of liquidated damages is discretionary under the statute and therefore cannot constitute a penalty within the meaning of Code of Civil Procedure section 340. ( *see Jensen, supra,* 35 Cal.App.4th at p. 133 ["Code of Civil Procedure section 340, subdivision (1), applies only where the penalty is mandatory."].) It offers two arguments in support of its position. First, Hypertouch contends that liqui-dated damages are not "mandatory" because section 17529.5, subdivision (b)(2) requires the trial court to reduce liquidated damages to a maximum of $100 per e-mail or $100,000 per incident if it finds the defendant "established and implemented . . . practices and procedures reasonably designed to effectively prevent . . . e-mail advertisements that are in violation of [the statute]." In Hypertouch's view, this safety valve provision effectively renders the imposition of penalties discretionary.

In *TJX Companies, supra*, 163 Cal.App.4th 80, the appellate court considered and rejected a similar argument. The specific issue presented in *TJX Companies* was whether claims arising under a statute that required the court to impose "a civil penalty not to exceed two hundred fifty dollars ($250) for the first violation and one thousand dollars ($1,000) for each subsequent violation" was a penalty within the meaning of Code of Civil Procedure section 340. ( 163 Cal.App.4th at p. 84.) The plaintiff argued that because the court could choose any penalty amount above the statutory maximums, the penalties was discretionary.

The appellate court disagreed, explaining that the statute did not provide the trial court discretion to decide whether or not to impose penalties. Instead, the statute only provided the court discretion in determining "the *amount* of the penalty assessment." ( *TJX Companies, supra*, 163 Cal.App.4th at p. 86.) The court further noted that although the amount of the penalty could " [presumably . . . span between a penny (or even the proverbial peppercorn we all encountered in law school) to the maximum amounts authorized by the statute," the imposition of some penalties was still mandatory. ( *Id.* at p. 86.)

In this case, the language of section 17529.5, subdivision (b)(2) cannot be meaningfully differentiated from the statute at issue in *TJX Companies*. The subdivision requires the court to reduce the liquidated damages to a maximum of $100 per e-mail or $100,000 per incident. Therefore, although the trial court is required to 845 reduce liquidated damages, *845 even to a nominal amount, nothing in the subdivision suggests that the court is permitted to dispense with penalties altogether.

Additionally, Hypertouch argues that liquidated damages are discretionary, rather than mandatory, because the plaintiff has the option to choose whether to allege a claim for liquidated damages. This exact argument has been raised by

Hypertouch in other proceedings and rejected: "Hypertouch's argument . . . misses the point; if, as here, the plaintiff does allege such claim and, further, is able to establish a violation of § 17529.5(a), an award of liquidated damages is mandatory." ( *Hypertouch Inc. v. Azoogle.com, Inc.* (N.D.Cal., Mar. 19, 2009, No. C-08-4970 MMC) 2009 U.S.Dist. Lexis 25999, p. *6, fn. 4, affirmed by *Azoogle.com, supra*, 2010 U.S.App. Lexis 14121 at pp. *3-*4 ["We . . . agree with the district court that Hypertouch's claims for liquidated damages under . . . [section] 17529.5(b)(1)(B)(ii) were subject to . . . [Code of Civil Procedure section] 340(a)'s one-year statute of limitations."].)

Hypertouch's argument also fails to consider why our courts have held that discretionary, as opposed to mandatory, penalties are not subject to a one-year limitations period: "If the one-year limitations period applied to discretionary penalties, a plaintiff would be placed in the untenable position of being unable to determine the applicable statute of limitations until after trial, when the court determined whether to allow up to [such] damages." ( *Jensen, supra*, 35 Cal.App.4th at p. 133; see also *Holland v. Nelson* (1970) 5 Cal.App.3d 308, 312 [ 85 Cal.Rptr. 117].) Those concerns are not present where the plaintiff is permitted to choose at the outset whether to pursue penalties that are ultimately mandatory if a violation is shown.

In sum, Hypertouch may seek actual damages for any e-mail it received within three years prior to the filing of the complaint and liquidated damages for any e-mail received within one year prior to the filing of the complaint. Although Code of Civil Procedure section 340 limits the type of recovery that Hypertouch may seek for e-mails received more than one year prior to the filing of this action, it does not bar Hypertouch's claims on those e-mails altogether. As a result, Primary Ads 846 is not entitled to summary adjudication.[20] *846

20  Hypertouch's complaint includes a cause of action for "Violation of California Business Professions Code, §§ 17200 *el seq.*" Although the trial court's order does not contain any independent analysis of the section 17200 claim, it granted summary judgment in favor of Respondents. The parties' appellate briefs do not reference or present any legal argument regarding the section 17200 claim. Because we reverse the trial court's order granting summary judgment, we necessarily reverse the grant of summary judgment on the section 17200 claim, but we do so without prejudice to Respondents, who are free to seek summary adjudication on that claim. Because we reverse the trial court's grant of summary judgment, we also vacate its award of costs to Respondents.

## DISPOSITION

We reverse the trial court's grant of summary judgment, vacate its award of costs and remand for further proceedings consistent with this ruling.

Woods, Acting P. J., and Jackson, J., concurred.

847  *847

