Joshua Lapin, Pro Se Plaintiff

401 E 8th ST
STE 214 PMB 7452
Sioux Falls SD 57103

Email: thehebrewhammerjosh@gmail.com

Facsimile: (605) 305-3464

**UNITED STATES DISTRICT COURT**

**DISTRICT OF COLORADO - DENVER**

| | |
|---|---|
| Joshua Lapin | Case No.: 1:22-cv-01543-CMA-SKC |
| Plaintiff, | |
| vs. | **PLAINTIFF'S RESPONSE TO AMERICAN** |
| | **AUTO SHIELD LLC'S MOTION TO** |
| Flex Marketing Group, LLC | **DISMISS PURSUANT TO FED. R. CIV. P.** |
| American Auto Shield LLC | **12(B)(6)** |
| Nrrm LLC dba CarShield | |
| John Doe Sender | |
| | |
| Defendants | |

# <u>INTRODUCTION</u>

COMES NOW Pro Se Plaintiff Joshua Lapin, responding in opposition to Defendant American
Auto Shields Motion To Dismiss Pursuant to FED. R. CIV. P. 12(b)(6)

# <u>ARGUMENT AND RESPONSES</u>

In contrast to Flex Marketing Group's pending 12(b)(2) and 12(b)(6) motion, the instant Rule 12(B)
(6) motion on behalf of American Auto Shield LLC is outright legally frivolous and provably so.

1

MOTION

As far as plaintiff can discern, not one argument in the instant motion has a valid or reasonable basis in law or in common sense, let alone a single s*lightly* triable issue.  Plaintiff is aware of the gravity and boldness of this statement, and proceeds to reveal the lack of merit of each and every argument presented therein.  Any arguments not addressed to in this response will be insufficient to grant dismissal under 12(b)(6) on their own.

**Kass "Argues" American Auto Shield Is Not An "Advertiser"**

First, Kass claims that "[plaintiff's] Complaint repeatedly states in conclusory fashion that AAS 'advertised' to Lapin through unsolicited emails." The complaint directly alleges AAS advertised its products in these UCE's, with supporting evidence, in at least the following places of the original complaint:

Page 12, line 3 "John Doe Sender sent these [allegedly] unlawful UCE's which Advertise the Vehicle Service Contracts of CarShield and AAS."

Page 14, lines 4-6 "Each of the UCE's purport to offer Carshield's Vehicle Service Contracts [which are actually AAS's Vehicle Service Contracts]."

Page 26, lines 3-6 "Whois Data for these ("Flex Domains"), or ("KetoSoup domains"), utilized in sending the ketosoup UCE's, is shown below, but may include some sending domains not specifically utilized in the sending of UCE's advertising Carshield / AAS:"

Page 65 lines 18-22: "Since CarShield, and AAS advertised in UCE's sent by Flex Marketing LLC, and John Doe Sender, the co-advertisers would be considered ("Advertiser") as defined by 37-24-41(1): "Advertiser," a person or entity that advertises through the use of commercial e-mail advertisements;

Page 66, lines 21-23: "[John Doe and Flex] sent and 'caused to be transmitted ' the illegal emails in which Carshield / AAS are alleged to have illegally advertised within."

Page 67, lines 12-13 [in the prayer for relief] "American Auto Shield, LLC ("AAS"): $1000 statutory liquidated damages, for its role in ("Advertising") in ALL the UCE's."

Page 68, lines 8-10 "[NRRM] is alleged to have "Co-Advertised" in these UCE's on behalf of itself and AAS, to the mutual benefit of both entities…"

Page 69, line 19 "...but [all the spams] advertise American Auto Shield's Vehicle Service contracts…"

Neither is this the first time that American Auto Shield has confused hundreds, perhaps thousands, of consumers through its advertising practices through "vendors and/or sellers of the American Auto Shield agreement" [complaint, page 7, BBB "pattern of complaints"].

**Kass Argues "AAS does not market and did not participate in the formulation or use of the emails."**

Even accepting this as true, that CarShield did the market and participation in the formulation and use of the spams, American Auto Shield nonetheless finds itself strictly liable for the same. American Auto Shield's Vehicle Service Contracts are the ones sold through these spams; Carshield does not have a single VSC.  Setting aside the disclaimer language of the spams which state, "CarShield & CarShield.com is not affiliated with any auto dealer or manufacturer" and "[Vehicle Service] contracts administered by American Auto Shield" (complaint's Exhibit B, fine print), the vehicle service contracts available on carshield.com and carshieldprotection.com are American Auto Shield's Vehicle Service Contracts [Exhibit A].  Carshield does not advertise the VSC's of anyone except for American Auto Shield, nor did anyone force AAS to hand over its marketing to Carshield.  "a third party promoted us" is the very responsibility-dodging sentiment that strict liability statutes solve, including the cause of action.  Nor does it matter if AAS's VSC's were being promoted by AAS or by its chosen third-party firm CarShield who exclusively markets the VSC's of AAS, or the extent of AAS's direct involvement or knowledge thereof.  Setting aside the plain language of 37-24-47, imposing strict liability on an Advertiser for spams sent by a third party,

advertiser's strict liability was first established, and confirmed many times thereafter, in *Hypertouch, Inc. v. Valueclick, Inc.*,191 Cal.App.4th 1209 (Cal. Ct. App. 2011). "...the statute makes an entity strictly liable for advertising in a commercial e-mail that violates the substantive provisions described in section17529.5, subdivision (a) regardless of whether the entity knew that such e-mails had been sent or had any intent to deceive the recipient." *Id*  Accordingly, AAS's directly knowledge or participation in these unlawful spams is irrelevant.  Its products were advertised and it stood to benefit from the tortious advertisements.  See also, Restatement (Second) of Conflict of Laws § 171 comment c .  "Vicarious liability may also be imposed by application of the local law of some state other than that of conduct and injury. So, for example, vicarious liability may be imposed under the local law of the state where the relationship between the one sought to be held liable and the tortfeasor is centered. Application of the local law of this state to impose vicarious liability is particularly likely if this state has some relationship to the injured plaintiff (see Illustration 6). There are undoubtedly still other situations where vicarious liability may be imposed."  While South Dakota law should apply over Colorado law, it's worthwhile to mention that Colorado public policy concurs with strict liability in similar circumstances.  Colorado law adopts the doctrine of strict liability in product liability, following the Restatement (Second) of Torts § 402A. *Union Supply Co. v. Pust*, 583 P.2d 276, 280 6 Case 1:15-cv-00518-WJM-NYW Document 355 Filed 09/22/17 USDC Colorado Page 6 of 22 (1978) (citing *Hiigel v. Gen. Motors Corp*., 544 P.2d 983 (1975)).Under Colorado law, the *sine qua non* of a strict liability claim is the 'sale' of a 'product.'" Hidalgo v. Fagen, Inc., 206 F.3d 1013, 1017–18 (10th Cir.2000).

**Choice of Law**

Setting aside that "Federal courts regularly decline to conduct fact-intensive choice of law analyses at the motion to dismiss stage..." *F.D.I.C. v. First Interstate Bank of Denver*, 937 F. Supp. 1461, 1466 (D. Colo. 1996) "A definitive choice of law determination is inappropriate and premature at this Rule 12 phase of the case stage" Id, quoting from *Feingold v. State Farm Mut. Auto. Ins. Co*., 2012 WL 1106653," Kass's choice of law arguments, in accordance with the rest of the instant motion, are not only weak...they are legally frivolous, and debunked as follows:

**"Colorado does not recognize a private right of action for the alleged spamming and indeed such laws violate Colorado public policy."**

Colorado is not the state with the most significant relationship with the unsolicited commercial email spams, South Dakota is.  Colorado's public policy does nothing except reinforce the same to be true.  Kass refers to Colorado's anti-spam law, the "Colorado's "Spam Reduction Act of 2008" as his saving grace when its actually his achilles heel. The act states "(h) This section shall apply when a commercial electronic mail message is sent to a computer located in Colorado or to an electronic mail address that the sender knows, or has reason to know, is held by a Colorado resident."  Considering plaintiff is a South Dakotan resident/domicile, Colorado's spam law outright expresses its own disinterest in the matter.  Neither does the application of South Dakota law violate Colorado's public policy.  The same act states "The remedies, duties, prohibitions, and penalties of this subsection (4) are not exclusive and are in addition to all other causes of action, remedies, and penalties provided by law."  In summary, Colorado public policy actually accomplishes the following:  A)  Expresses its own disinterest in this matter, B) Serves as a statutory directive on choice of law, declaring its own remedies to be non-exclusive and in addition to other causes of action.  Kass (and Newman, from Flex's pending motion to dismiss) disrespect Colorado Public Policy far more than plaintiff ever has, by making weak arguments that Colorado is the state with the greatest relationship, despite A, and that Colorado's remedies shall displace the South Dakotan plaintiff's cause of action brought about by his home state, despite B.  See also, Restatement (Second) of Conflict of Laws s 6(1) "A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law."

Accordingly, we can easily correct a false statement from Kass as follows "If South Dakota residents were free to bring private claims in Colorado, that would ~~clash with~~ **compliment** Colorado's legislative intent and public policy."

**"It is unfair and improper to hold an entity liable under the local law of one state when it molded its conduct to conform to the requirements of another state. RESTATEMENT (SECOND) 4869-7683-5882.1 10 CONFLICT OF LAWS § 6(2) cmt. g."**

This argument represents a *material* blindness to the legislative framework upon which this dispute

arises.  Kass mysteriously does not even mention the CAN-SPAM Act of 2003: The nationwide anti-spam legislation which sufficiently solved this very problem nearly 20 years ago. Congress, in 2002, was well-aware of the concerns faced by 'legitimate' email marketing providers who send <u>legal</u> unsolicited commercial email nationwide, or otherwise across state lines.  See the following from the CAN-SPAM Act's "congressional findings and policy":

15 U.S. Code § 7701 (11):

"Many States have enacted legislation intended to regulate or reduce unsolicited commercial electronic mail, but these statutes impose different standards and requirements. As a result, they do not appear to have been successful in addressing the problems associated with unsolicited commercial electronic mail, in part because, since an electronic mail address does not specify a geographic location, it can be extremely difficult for law-abiding businesses to know with which of these disparate statutes they are required to comply."  See also, "there is a substantial government interest in regulation of commercial electronic mail on a nationwide basis; senders of commercial electronic mail should not mislead recipients as to the source or content of such mail" *Id*, at (b)(1) – (b)(2).

The CAN-SPAM Act solved this problem by creating a nationwide, uniform standard which regulated commercial electronic mail, and preempted state-level spam laws to the extent that they govern anything other than "falsity or deception" in commercial email.  15 USC 7707, Sec.8(b)(1): " (1) IN GENERAL.--This Act supersedes any statute, regulation, or rule of a State or political subdivision of a State that expressly regulates the use of electronic mail to send commercial messages, except to the extent that any such statute, regulation, or rule prohibits falsity or deception in any portion of a commercial electronic mail message or information attached thereto. "

This ensures that any non-preempted portion of state-level spam laws would also arise to a violation of the Federal Anti-Spam Law as well.  States were barred from regulating commercial email beyond 'falsity or deception,' successfully establishing the nationwide standard that email

MOTION

marketers needed to follow.  By enabling and empowering states to regulate falsity or deception, congress enabled the states to compliment the Federal Governments anti-spam efforts pertaining to the same falsities and deceptions that were now-banned nationwide under CAN-SPAM, so long as the states efforts did not impose additional requirements or contradict the newly established nationwide, uniform standard for unsolicited commercial electronic mail created by the same act. This ingenious solution ensured that email marketers who would no longer face the challenges of anti-spam legislation between the states.  Nearly two decades thereafter, Kass complains of a long-resolved issue; accordingly, the argument is frivolous.  When companies send spam or advertise within them, the CAN-SPAM Act ensures that their conduct must only "conform to the requirements" of CAN-SPAM, and all other <u>contradictory or additional</u> state/local regulations would be preempted.  When those same entities fail to conform to CAN-SPAM's clear requirements, they can expect to run afoul of CAN-SPAM <u>AND</u> of the non-preempted portions of the 34 states who have enacted anti-spam laws of their own, which merely reenforce and support the national, uniform standard.  Applied to the instant matter, AAS and NRRM needed to only worry about compliance with this national uniform standard and NOT the laws of the 50 states for the same reason.  Kass is outright wrong that holding a Colorado entity liable under the non-preempted portion of South Dakota Spam law is unfair; this legislative framework ensures that AAS has robbed itself of the "benefit of the doubt" long ago.  Therefore, the following additional arguments from Kass are also frivolous for the same reasons:

""Predictability and uniformity of result in the application of law is particularly valuable "in areas where the parties are likely to give advance thought to the legal consequences of their transactions." Restatement (Second) Conflict of Laws § 6(2) cmt. i."" <u>Predictability and uniformity of result was established by the CAN-SPAM Act of 2003 long, long ago.</u>

"Application of South Dakota's anti-spam statute, as construed by Lapin in the Complaint, would allow a person living anywhere in the world and possessing a unique South Dakota "residency" status to extract thousands of dollars from entities like the instant defendants

(in the case of Lapin, he is seeking $171,000). How could those entities give "advance thought" to the consequences of their activities in such a bizarre factual scenario?"  Because CAN-SPAM's uniform, national standard is the only "advance thought" those entities needed to be wary of the consequences thereof.  Also, Flex admitted in their pending motion to dismiss that the location of injury is fortuitous, and plaintiff agreed in his response to *Id.*  Further, CAN-SPAM's findings concur that an email address "does not specify a geographic location" 15 U.S. Code § 7701 (11), as cited and pasted above.  The states, including South Dakota, are free to regulate the same acts of 'falsity or deception' which are unlawful under the national, unform standards of CAN-SPAM, regardless of the merely fortuitous location of the plaintiff at the time those spams are received.

"Colorado, like the federal government, has empowered only government enforcers and certain internet industry actors to assail improper email marketing."  Incorrect, the Federal Government (through CAN-SPAM) enabled the states to 'assail improper email marketing,' as it relates to falsity and deception.  Colorado's spam law declares itself to be inapplicable to the instant matter, as described above, and further serves as a statutory directive on choice-of-law, in declaring that its own remedies are non-exclusive and are in addition to other remedies and causes of action, including the one available to the instant plaintiff.

**"Even if AAS knew Lapin was a world traveler, it is not plausible that it would say to itself, 'we should be ready to be sued under South Dakota law because a digital nomad living in Bali may somehow get an email that mentions our company.' It is not reasonable to assume that AAS should have expected to be a defendant under the facts alleged."**  By failing to comply with CAN-SPAM, AAS should have expected to run afoul of the same, and all state-laws which govern the same nonpreempted violations of the same, regardless of the Plaintiff's fortuitous location.

Also, Plaintiff did not receive any of the spams while in Bali, and was only in Bali for 30 days.

**"Lapin's international, remote lifestyle hardly suggests a person in his position should reasonably expect that simply because he has a "personal mail box" in South Dakota (id. ¶ 2), he can haul a Colorado company into Colorado federal court to face a claim under South**

1  **Dakota's anti-spam law."**

2  Plaintiff does not 'simply have a personal mail box' in South Dakota and then believe his is a

3  resident/domicile of South Dakota on that basis.  Please see (Exhibit S of Dkt 30) for the plethora of

4  documents, affidavit, and records in support of Plaintiff's fulfilling the requirements for South

5  Dakota's residency for full-time travelers, as well as Plaintiff's proof of not-maintaining-residency-

6  anywhere-else-ever-since establishing residency/domicile in South Dakota (Exhibit U of Dkt 30),

7  containing an extremely detailed record/itinerary of plaintiff's location at all times material and

8  beyond.  Aside from that, it remains unclear if AAS could be hauled into a South Dakota court for

9  advertising in a spam sent by a third party to a South Dakota resident.  Accordingly, it is all-the-

10  more important that AAS's forum grants full-faith and credit to the laws of South Dakota, considers

11  Restatement (Second) of Conflict of Laws s 6 comment k, pertaining to the concept of

12  "reciprocity", and enforces the laws of the State of South Dakota, in the possible event that South

13  Dakota lacks personal jurisdiction over the tortfeasor necessary to enforce its own laws for the

14  benefit of its own residents.  This is where the needs of the interstate system "kicks in," there is a

15  reciprocal need for Colorado to help South Dakota to enforce its laws, and Colorado's own public

16  policy, Colorado's own legislative framework, and national legislative framework, all support the

17  same.

18  As to "Unlike South Dakota, Colorado's residency requirements are more demanding and require

19  more of a sense of permanence than that associated with rented mailbox," setting aside that

20  Plaintiff's South Dakota domicile and residency is <u>NOT</u> limited to a mailbox, as described earlier

21  on this page, The question being raised here is, Would Colorado's [allegedly stricter] residency

22  laws render plaintiff a non-South Dakotan for the purposes of standing under South Dakota's anti-

23  spam law?  The answer is a resounding no.  The concept of choice-of-law for 'residency' is not

24  before this court; Plaintiff does not claim to be a Colorado resident nor could he.  For the purposes

25  of determining whether Plaintiff  has standing under South Dakota Anti-Spam Law, all that matters

26  is whether Plaintiff is a South Dakota resident in the eyes of South Dakota.  The fact that plaintiff is

27  a digital nomad who travels constantly is irrelevant; one does not lose domicile/residency until they

28

MOTION

establish a new one.  Plaintiff does not establish a new residence in each country he visits for a 30 day period, on a tourist visa, with no intention of making it my home (with respect to those great countries, cultures, and people all over the world that I've been blessed to meet.)

**"South Dakota's Interest in Protecting Absent State "Residents" is Not Compelling....This factor/principle also favors applying Colorado law."**

As stated by Flex and agreed by Plaintiff, the location of the injury in this matter is merely fortuitous.  Therefore, South Dakota's valid interest in protecting its residents from spam within the "savings clause" of CAN-SPAM is a perfectly legitimate and compelling exercise of the Federal-State legislative framework layed out by the Federal Anti-Spam Law and its solicitation of help in cracking down on 'falsity and deception' as part of that effort.  Also, as at least 34 states have anti-spam laws in place, South Dakota is far from isolated in legislating this same interest.  The differences in <u>who</u> is granted <u>what</u> right of action is immaterial to the overwhelming federal and state "army" of anti-spam legislation condemning the same conduct, and joint effort in eliminating such unlawful practices in spam sent from or to the United States and its people.  Further in support of the fortuitousness of Plaintiff's presence "in or out of South Dakota" at the time he received the spam is the following hypothetical:

A Colorado Resident who receives spam email while visiting family in South Dakota is <u>NOT</u> afforded a right of action by South Dakota's anti-spam law since his/her email addresses are not "South Dakota electronic mail addresses" since they are not "ordinarily accessed from a computer located in [South Dakota]" nor are they "furnished to a resident of [South Dakota]."  But that same person is protected by Colorado's spam reduction act of 2008 since the spams were sent to a Colorado Resident.

For the same reason, a South Dakota resident who visits family in Colorado and receives spams while they're present in the Centennial State is afforded no protection by Colorado's spam reduction Act because they are not Colorado residents, but that same person <u>is</u> still afforded their powerful SDCL 37-24-41 *et seq* right of action because the spams were sent to a South Dakota resident who happened to irrelevantly be located in Colorado at the time.

Anyone who violates the Colorado or South Dakota statutes should and could have expected to be liable under those acts because the CAN-SPAM's uniform, national standard established any&all requirements that email marketers must follow in order to be compliant with all [non-preempted portions of] spam laws nationwide.

**Joinder and Reverse Joinder**

To the extent that arguments raised in Plaintiff's response to Flex Marketing Group's motion to dismiss (pending at Dkt. 30) support the instant motion to dismiss from AAS, plaintiff conditionally requests to join in with his own filing at (Dkt. 30).

To the contrary, if arguments raised herein better "hit the nail on the head" than anything raised in Dkt. 30, plaintiff requests that arguments made herein join in support of (Dkt. 30).

## Conclusion

Upon plaintiff's information and belief and perception, the instant motion to dismiss is legally frivolous, and lacks a single meritorious argument.  American Auto Shield is an "Advertiser" in these spams, regardless if it participated in the formulation or use of the [spams], and remains strictly liable for the same.  Colorado public policy and legislation supports South Dakota spam law applying in the instant matter under the instant circumstances, and national public policy and legislation governing spam ensures fairness and predictability of result, only reenforced by the Restatement (Second).   Plaintiff is a perfectly legal domicile and resident of South Dakota, and his status as a full-time traveler does not detract from the same.  In support, Defendant Flex Marketing Group admits that Plaintiff's location at the time he received the spams is fortuitous, and state/federal policy, yet again, reenforces the same to be true.

## Certificate Of Service

This response will be served onto Defendants' counsel through CM/ECF, as well as by email as stipulated.

/s/ Joshua A. Lapin
Joshua A Lapin
Pro Se Plaintiff 8/08/22
_____

     Signature